**Brandon BRAVO, a minor, by his next friends and parents, Leonorilda Gamboa and Epifanio Bravo Hernandez; and Leonorilda Gamboa and Epifanio Bravo Hernandez, individually**

v.

**SUMNER REGIONAL HEALTH SYSTEMS, INC., d/b/a Sumner Regional Medical Center,**

v.

**Robert Dabney Phillips, M.D.**

Court of Appeals of Tennessee, Western Section, at Nashville.

Aug. 6, 2003 Session.

Dec. 23, 2003.

Permission to Appeal Dismissed by Supreme Court April 5, 2004.

James D. Kay, Jr., John J. Griffin, and Joanna Thomson, Nashville, Tennessee, for the appellants, Leonorilda Gamboa and Epifanio Bravo Hernandez, individually and as next friends and parents of Brandon Bravo.

Dixie W. Cooper and Lisa D. York, Nashville, Tennessee, for the appellee, Robert Dabney Phillips, M.D.

## OPINION

HOLLY M. KIRBY, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

This is a medical malpractice case. The plaintiff was pregnant and came to the hospital to have labor induced for delivery of her baby. The defendant obstetrician-gynecologist had not previously treated

the plaintiff, but was the attending physician for the delivery of her baby. After a lengthy labor, the defendant physician attempted to deliver the baby vaginally. When problems developed, the defendant physician immediately delivered the baby by Cesarean section. The baby suffered injuries from the loss of oxygen during the birthing process. The plaintiffs, the child's mother and father, individually and on behalf of the child, sued the defendant physician, asserting that he breached the standard of care in underestimating the size of the baby and in the delivery of the baby. The defendant physician moved for summary judgment. In response, the plaintiffs submitted the expert affidavit of an obstetrician-gynecologist from Georgia, whose medical practice had been limited to gynecologic and fertility matters for several years. The defendant physician objected, arguing under Tennessee Code Annotated § 29–26–115 that the plaintiffs' proffered expert was not competent to testify regarding obstetrics since he had not practiced in that specialty for several years and that he did not satisfy the "locality rule." The trial court found that the expert was not competent and granted summary judgment in favor of the defendant physician. The plaintiffs now appeal. We reverse and remand, finding that the affidavit of the plaintiffs' expert indicated that he was competent to testify about obstetrics and satisfied the locality rule.

On November 1, 2000, Plaintiff/Appellant Leonorilda Gamboa ("Mother"), who was pregnant, went to Sumner Regional Medical Center ("Sumner Medical") in Gallatin, Sumner County, Tennessee and had an obstetric ultrasound test performed. The ultrasound test results described the size of the baby, estimated the gestational age as thirty-nine (39) weeks two (2) days, and estimated a date of delivery the week of November 6, 2000.

Approximately four weeks later, well after the estimated due date, the Sumner County Health Department scheduled Mother for an induced delivery at Sumner Medical. On the morning of December 1, 2000, Mother arrived at Sumner Medical for the scheduled labor induction. Defendant/Appellee Robert Dabney Phillips, M.D. ("Dr.Phillips"), was on call for his medical group at Sumner Medical, and consequently became Mother's attending physician. Prior to that date, Dr. Phillips had neither treated Mother nor been involved in her prenatal care.

At approximately 8:30 a.m., Dr. Phillips met with Mother. She had reported leaking amniotic fluid, with a history of delivering a nine-pound baby in 1995. Mother was unsure of her last menstrual cycle. Dr. Phillips obtained the November 1, 2000 ultrasound report showing pertinent fetal measurements and an estimated gestational age at that time of thirty-nine (39) weeks two (2) days. From the information in the ultrasound report, Dr. Phillips estimated the fetal weight to be about 4000 to 4500 grams, or approximately 8.8 to 9.9 pounds. No further tests to estimate the size of the baby were done. Dr. Phillips anticipated vaginal delivery of the baby.

Pitocin was administered to Mother and labor progressed slowly. Around 5:45 p.m., Mother began pushing. This continued for about one and a half hours. At approximately 7:39 p.m., Dr. Phillips attempted a vacuum extraction of the baby, and the baby's head was delivered at about 7:41 p.m. With a shoulder dystocia (also called "stuck shoulders") identified, the baby's head was put back into the vagina. A Cesarean section was performed at approximately 7:54 p.m. The child, Plaintiff/Appellant Brandon Bravo ("child"), was delivered at approximately 8:10 p.m., weighing thirteen pounds seven ounces. The child was hypoxic, or lacking oxygen,

and was immediately handed over to the pediatrician for resuscitative measures. He was subsequently transported to Vanderbilt Medical Center, and was diagnosed as having experienced prolonged asphyxia with hypoxic-ischemic encephalopathy, or brain damage due to lack of blood flow.

On October 4, 2001, Mother and the child's father, Epifano Bravo Hernandez ("Father"), individually and on behalf of the child (collectively, "plaintiffs"), filed this lawsuit against Sumner Medical and Dr. Phillips for medical malpractice, seeking damages for the injuries the child sustained during the birth process. The complaint alleged that Dr. Phillips deviated from the applicable standard of care in failing "to treat, observe, detect, test, diagnose, report and monitor the risk factors and medical conditions which [Mother] exhibited" prior to delivery, and also in failing "to examine [Mother] and perform or cause to be performed such procedures, examinations, tests and treatments as [Mother's] condition would have dictated to a reasonably careful and competent medical professional."

On December 10, 2001, Dr. Phillips filed an answer, denying the plaintiffs' allegations of negligence. Discovery ensued. On February 14, 2002, in response to interrogatories, the plaintiffs identified Joel S. Engel, M.D. ("Dr. Engel"), as an expert expected to give testimony at trial in support of their position.

On April 29, 2002, the trial court entered a scheduling order. February 1, 2003, was established as the deadline for the plaintiffs to designate their expert witnesses for trial, and the trial was set for September 1, 2003.

On July 18, 2002, Dr. Phillips moved for summary judgment. In support of his motion, he submitted his own affidavit, stating that his medical treatment of Mother conformed to the required standard of care. On August 23, 2002, the plaintiffs filed a response in opposition to Dr. Phillips' motion for summary judgment. The plaintiffs' response was supported by the affidavit of Dr. Engel.

Dr. Engel's affidavit stated that he was licensed to practice medicine in Georgia in 1969, and that he had been certified by the American Board of Obstetrics and Gynecology since 1974. Further, he stated that he practiced in obstetrics and gynecology in Georgia from 1972 to 1993. In 1993, however, Dr. Engel eliminated obstetrics from his practice and focused on gynecology and infertility.

To demonstrate that he was qualified to testify about Dr. Phillips' obstetric care of Mother, Dr. Engel stated that he was "familiar with the recognized standard of care applicable to obstetricians during November and December 2000 in Gallatin and in communities similar in size to Gallatin." In addition to his private practice, Dr. Engel stated, since 1999, he had served on the State of Tennessee Bureau of TennCare, Medical Service Appeals Board ("TennCare Board"). He said that he was a gynecology-obstetrics expert for TennCare. As part of his service on the TennCare Board, Dr. Engel reviewed gynecological-obstetric medical records from smaller Tennessee communities near major regional medical centers, communities that are similar in size to Gallatin. Through his service on the TennCare Board, Dr. Engel asserted, he had become familiar with the medical resources available to obstetricians in communities similar in size to Gallatin. He maintained that he had reviewed obstetric cases from Tennessee communities similar to Gallatin, and that he was familiar with the treatment, care, and skill of practitioners in communities similar to Gallatin.

Dr. Engel also said that he had reviewed relevant materials on Gallatin, and that he was familiar with the applicable standard of care for obstetrics and gynecology in Gallatin and similar communities:

... I have reviewed geographical data, statistical data and literature concerning Gallatin ... and Sumner Regional Medical Center. I know that in 2000, Gallatin, Tennessee had a population of approximately 23,230 and that Sumner County had a population of approximately 130,449. I know that Sumner Regional Medical Center is a not for profit facility with 155 bed capacity with over 700 staff employees and over 100 physicians. Sumner Regional Medical Center delivered approximately 756 babies in 2001 and treats over 25,000 patients per year in their 24 hour a day Emergency Room. Further, Sumner Regional Medical Center is 32 miles or approximately a 45–minute drive from Vanderbilt University Medical Center, a leading medical complex and teaching hospital. Sumner County, Tennessee has three (3) general medical surgical hospitals. Based on this and other information, I am familiar with the medical resources available to the medical community in Gallatin, Sumner County, Tennessee. I am familiar with the standard procedures and practices of obstetricians in communities similar in size to Gallatin, Sumner County, Tennessee.

... Thirdly, I receive referrals from small communities near Atlanta, Georgia that are similar in size to Gallatin, Sumner County, Tennessee. For example, I receive referrals from Rome, Floyd County, Georgia which is 65 miles from Atlanta. Floyd County has a population of 91,183 people and has two (2) general medical surgical hospitals. The city of Rome has a population of approximately 31,000 people. I am familiar with the standard of care for obstetrics and gyne-cology in 2000 in Rome, Floyd County, Georgia. As another example, I receive referrals from Columbus, Muscogee County which is 109 miles from Atlanta. Muscogee County has a population of 184,134 people with four (4) general medical surgical hospitals. I am familiar with the standard of care for obstetrics and gynecology in Columbus, Muscogee County, Georgia. The medical communities in Floyd County, Georgia and Muscogee County, Georgia are similar to the medical community in Sumner County, Tennessee. Because of the referrals I receive from Muscogee County and Floyd County, I am familiar with the standard procedures and practices of obstetricians in Georgia communities similar to Gallatin, Sumner County, Tennessee.

... Lastly, I have visited hospitals in a community similar to Gallatin, Sumner County, Tennessee. I have reviewed medical records from the hospitals in a community similar to Gallatin, Sumner County, Tennessee. I have attended Obstetric and Gynecology seminars/conferences where I further became familiar with the standard of care applicable to obstetricians in communities similar to Gallatin, Sumner County, Tennessee.

Dr. Engel then gave his opinion regarding Dr. Phillips' medical care in this case. He stated that he had reviewed all of Mother's records, and outlined the relevant information from them. From his review of the records, Dr. Engel stated the following opinions:

- The obstetric practice in this case was well below the standard of care.

- There was sufficient data indicating that this was going to be a very large for gestational age infant if allowed to proceed to term.

- The prenatal fundal height measurements were all consistent with macrosomia.
- The ultrasound performed on November 1, 2000, some four weeks prior to induction, was supportive of macrosomia with some of the parameters measured being off the scale.
- The standard of care required that a second ultrasound be performed prior to the induction at term to confirm the size.
- The physician's estimate of the infant's size as 4,000 to 4,500 grams was totally unrealistic, and falls below the standard of care, in view of the date and reasonable evaluation of fetal size at the time of induction.
- To miss the size by some 3.5 pounds was unacceptable and well below the standard of care.
- There are safe limits as to the size of infants that should be induced.
- The usual maximum weight is 10 pounds.
- The attempt to deliver vaginally with the vacuum extractor as opposed to proceeding directly to a cesarean section was below the standard of care.
- This patient should not have been induced, but should have had a primary cesarean section. To induce under these circumstances falls below the standard of care.
- There was no recording of the estimation of the size of the fetus in relation to the size of the mother's pelvis in this case. Failure to record such vital information falls below the standard of care.
- The prolonged asphyxia as well as the trauma inflicted in attempting to deliver vaginally was below the standard of care.

Dr. Engel asserted that the available information indicated that the baby would be too large to safely deliver vaginally, and for Dr. Phillips to "miss the fetal size by some 3.5 pounds is unacceptable and well below the standard of care." He stated that Dr. Phillips' attempt to deliver the baby vaginally rather than proceeding directly to a Cesarean section departed from the applicable standard of care and directly resulted in Brandon's profound injuries.

On August 30, 2002, the trial court heard arguments on Dr. Phillips' motion for summary judgment, and on September 9, 2002, the trial court issued its memorandum opinion. The trial court noted that Dr. Engel admitted that the had not practiced obstetrics since 1993, but limited his practice to gynecology and infertility. It distinguished between obstetrics and gynecology: "The speciality of obstetrics ... deals with the care of women during pregnancy, labor and the postlabor period. The speciality of gynecology ... [deals] with the diagnosis and treatment of diseases affecting the organs peculiar to women." The trial court held:

> T.C.A. § 29–26–115 requires any person attempting to testify as to the acceptable standard of care must not only be licensed in the specialty but must have practiced the specialty during the year preceding the date of occurrence. The Affidavit establishes the license requirement, but not the practice requirement. Plaintiff, [sic] relies upon Dr. Engel reviewing Tenn–Care records regarding OB–GYN and Dr. Engel is a visiting associate at Emory University, Department of Gynecology and Obstetrics. No additional explanation or support is provided to demonstrate actual practice of obstetrics since 1993. In light of the admission of non-practice since 1993, the Court cannot find the Plaintiff's offered expert to be qualified pursuant to the

practice requirement of T.C.A. § 29–26–115.

Thus the trial court held that Dr. Engel was not qualified to testify under Tennessee Code Annotated § 29–26–115 because he had not practiced obstetrics during the year preceding the occurrence.

On September 11, 2002, the plaintiffs voluntarily dismissed Sumner Medical. On October 3, 2002, the trial court entered a final order granting Dr. Phillips' motion for summary judgment and incorporating in the order its September 9, 2002 memorandum opinion. From that order, the plaintiffs appeal.

On appeal, the plaintiffs argue that the trial court erred in disqualifying Dr. Engel on the basis that he had not practiced obstetrics during the year preceding the injury. Rather, the plaintiffs argue, Tennessee Code Annotated § 29–26–115 requires only that the expert have practiced in a specialty that would make his testimony relevant to the issues in the case. They claim that, because Dr. Engel's field of specialization is obstetrics and gynecology, and his practice in gynecology is relevant to the issues in the case, then his affidavit is sufficient. In the alternative, the plaintiffs argue that the trial court's grant of summary judgment to Dr. Phillips was premature, because the trial court's scheduling order allowed them until February 2003 to identify their expert witnesses, and because they did not have time to conduct sufficient discovery.

■ The trial court's grant of summary judgment is reviewed *de novo* with no presumption of correctness. *Warren v. Estate of Kirk,* 954 S.W.2d 722, 723 (Tenn. 1997). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. The appellate court must view the evidence in a light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences. *Warren,* 954 S.W.2d at 723 (quoting *Bain v. Wells,* 936 S.W.2d 618, 622 (Tenn.1997)). Once the moving party demonstrates that there are no genuine issues of material fact, the non-moving party must demonstrate, by affidavits or otherwise, that a disputed issue of material fact exists for trial. *Byrd v. Hall,* 847 S.W.2d 208, 211 (Tenn.1993). In addition, the determination of the trial court regarding the "admissibility, qualifications, relevancy and competency" of expert testimony, will be upheld absent an abuse of discretion. *See McDaniel v. CSX Transp., Inc.,* 955 S.W.2d 257, 263 (Tenn.1997); *see also Tilley v. Bindra,* No. W2001–01157–COA–R3–CV, 2002 WL 1000196, at *4 (Tenn.Ct.App. May 13, 2002). A trial abuses its discretion when it applies the wrong legal standard. *See McEvoy v. Brewer,* No. M2001–02054–COA–R3–CV, 2003 WL 22794521, at *6 (Tenn.Ct.App. Nov.25, 2003).

■ First, the plaintiffs argue that the trial court erred in disqualifying Dr. Engel on the basis that he had not practiced in obstetrics within the year preceding the injury. The plaintiffs note that there is no statutory requirement that the expert practice in the same specialty as the defendant, only that the expert practice in a specialty that would make his testimony relevant to the issues in the case. *See* Tenn.Code Ann. § 29–26–115(b). They point out that Dr. Engel is, in fact, board certified in the same specialty as Dr. Phillips, obstetrics and gynecology, which is one specialty, not two. As such, the plaintiffs allege, Dr. Engel received the same education, training, and certification as Dr. Phillips. In addition, the plaintiffs argue

that the practice of gynecology is clearly relevant to the practice of obstetrics, particularly in light of Dr. Engel's extensive experience, knowledge, and qualifications that support his statement that he is familiar with the applicable standard of obstetric care during the pertinent time.

In response, Dr. Phillips argues that the trial court was correct in determining that Dr. Engel's affidavit did not meet the specialty requirement of Tennessee Code Annotated § 29–26–115(b). Dr. Phillips notes that Dr. Engel practiced only gynecology, not obstetrics, within the year prior to the plaintiffs' injuries, and argues that issues related to gynecology and fertility are not relevant to the delivery of a baby. In addition, Dr. Phillips argues, Dr. Engel's affidavit did not satisfy the "locality rule," i.e., it did not show that Dr. Engel was familiar with the recognized standard of acceptable professional practice in Gallatin, Sumner County, Tennessee at the pertinent time. Though Dr. Engel claimed to be familiar with the appropriate standard, Dr. Phillips argues, the affidavit indicates that Dr. Engel never practiced obstetrics in Gallatin or similar communities, only that he received referrals as a fertility specialist from those communities.

The requirements for a plaintiff in a medical malpractice case is set out in Tennessee Code Annotated § 29–26–115, which states in pertinent part:

(a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred. . . .

(b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred. . . .

Tenn.Code Ann. § 29–26–115(a), (b) (Supp. 2003). From the plain language of the statute, the Tennessee Supreme Court has identified five requirements: [1]

[First,] [t]he affiant must demonstrate that he or she meets the geographic and durational residence and practice requirements. Second, the affiant must demonstrate that he or she practices in a profession or specialty that makes the affiant's opinion relevant to the issues in the case. Third, the affiant must demonstrate that familiarity with the recognized standard of professional practice in the community where the defendant practices or in similar communities. Fourth, the affiant must give an opinion concerning whether the defendant physician met or failed to meet the relevant standard of professional practice. Finally, the affiant must opine whether the defendant physician's negligence more likely than not caused the patient injuries that he or she would not otherwise have suffered.

---

**1.** Of course, the affidavit must also satisfy the general requirements of Tennessee Rule of Civil Procedure 56.06, regarding the form of affidavits generally. *See Church v. Perales,* 39 S.W.3d 149, 166 (Tenn.App.2000).

*Church v. Perales,* 39 S.W.3d 149, 166 (Tenn.App.2000).

■ Clearly, then, the trial court's statement of the standard in this case was erroneous; it is not necessary for the proffered expert to have practiced the same specialty as the defendant during the year preceding the date of the occurrence. Rather, it is required that he practice in a profession or specialty "which would make the person's expert testimony relevant to the issues in the case" during the year preceding the occurrence. Tenn.Code Ann. § 29–26–115(b); *See Ledford v. Moskowitz,* 742 S.W.2d 645, 647 (Tenn.Ct.App. 1987). While the trial court's decision on the competency of an expert witness is reviewed under an abuse of discretion standard, application of the wrong legal standard constitutes an abuse of discretion. On these undisputed facts, then, we can determine whether, in any event, Dr. Engel's affidavit satisfies the practice requirement under the statute.

The facts in this case present an unusual situation.[2] Dr. Engel is licensed in the same specialty as Dr. Phillips, that is, "obstetrics and gynecology," which satisfies the statutory requirement that the expert be "licensed to practice in ... a profession or specialty" that would make his testimony relevant to the issues in the case. However, the statute also requires that Dr. Engel *practice* in the relevant specialty in the year preceding the alleged malpractice. In this case, it is undisputed that it is necessary to look beyond the nomenclature of his field of specialty, since Dr. Engel limited his practice to gynecology after 1993 and has not engaged in the practice of obstetrics since that time. The

issues on which Dr. Engel is called to testify relate only to obstetrics, namely, Dr. Phillips' medical treatment of Mother during childbirth. The issue becomes whether Dr. Engel's license in obstetrics and gynecology, together with the parameters of his recent practice, "would make [his] expert testimony relevant to" the obstetric issues in this case. Tenn.Code Ann. § 29–26–115(b). Consequently, we will review pertinent caselaw.

In *Searle v. Bryant,* 713 S.W.2d 62 (Tenn.1986), the defendant physician performed emergency surgery on the abdomen of the plaintiff minor. The plaintiff subsequently developed an infection in the surgical wound that lasted for several days. The plaintiff sued the physician, alleging that he negligently caused her infection, negligently treated her infection, and that his negligence caused her to have an unnecessarily unattractive scar from the surgery. *Searle,* 713 S.W.2d at 63. At trial, the plaintiff submitted the testimony of an infectious disease specialist/clinical microbiologist who worked as the director of the clinical microbiology laboratory at Vanderbilt University Medical Center. The expert testified that he did not treat private patients and did not perform surgery. However, he maintained that he had become familiar with the applicable standard of care for surgeons by consulting with physicians on infectious diseases and by visiting hospitals in his role as an educator. The trial court found that the plaintiff's expert was incompetent to testify and struck his testimony. The appellate court reversed, finding that the expert's opinion regarding the prevention

---

2. The more common problem with expert testimony occurs when the expert is certified in a *different* specialty as the defendant, but claims that he is nonetheless familiar with the applicable standard of care. *See, e.g., Searle v. Bryant,* 713 S.W.2d 62, 64 (Tenn.1986)

(plaintiffs' expert was infectious disease specialist, but defendant was a surgeon); *Ledford v. Moskowitz,* 742 S.W.2d 645, 647–48 (Tenn. Ct.App.1987) (plaintiffs' expert was certified as a neurologist and internal medicine physician, but defendant was a psychiatrist).

and treatment of surgical wound infections was admissible in light of his experience. The appellate court concluded that the fact that the expert did not treat patients in private practice "goes to the weight of the testimony rather than its admissibility." *Id.* at 64.

In *Stokes v. Leung*, 651 S.W.2d 704 (Tenn.Ct.App.1982), the plaintiff was admitted to the hospital for acute depression, hallucinations, and other mental conditions. The next day, she jumped from the window of her hospital room, sustaining severe injuries. *Stokes*, 651 S.W.2d at 707. The plaintiff sued her treating physician, a specialist in internal medicine and cardiology. The plaintiff offered the expert testimony of a psychiatrist, who sought to testify that the defendant physician breached the standard of care by giving the plaintiff the wrong medication and putting her in an insecure room. The defendant objected to the expert's testimony, arguing that he was not qualified to give an opinion as to the standard of care in the medical field of the defendant physician. During *voir dire* of the expert regarding his qualifications, he stated that he was familiar with the standards of practice with regard to psychiatric patients in general medicine because he taught classes on the subject at the University of Tennessee Medical School. *Id.* at 706. The trial court admitted the expert's testimony. The appellate court affirmed, noting that the fact that the expert did not practice in the same medical field as the defendant physician went "more to the weight of the evidence rather than its admissibility." *Id.*

In *Ledford v. Moskowitz*, 742 S.W.2d 645 (Tenn.Ct.App.1987), the defendant psychiatrist admitted the plaintiff into the hospital for dysthymic disorder. Upon her release from the hospital, the defendant prescribed anti-psychotic medications. The medications resulted in side effects.

*Ledford*, 742 S.W.2d at 646. She was later admitted into a hospital in Atlanta, Georgia, and was diagnosed as having drug-induced neurological problems. In the hospital, she was treated by a neurologist, who discontinued the anti-psychotic medications. The plaintiff sued the defendant psychiatrist, claiming that he negligently prescribed and supervised the administration of anti-psychotic drugs. *Id.* at 647. The defendant psychiatrist filed a motion for summary judgment. In response, the plaintiff filed the affidavit and deposition of the neurologist who treated her at the hospital in Atlanta. The defendant psychiatrist argued that the neurologist was not qualified to testify because he did not practice in the same specialty or location as the defendant. The trial court agreed, finding that the proposed expert must "practice the specialty of the medical doctor being sued." *Id.* (quoting opinion of the trial court). Accordingly, the trial court granted summary judgment to the defendant psychiatrist. The appellate court reversed, stating that the trial court "incorrectly states the requirements of the statute, and that [the] proof sufficiently meets the standards set out in the statute...." *Id.* The appellate court noted that the plaintiff's expert need not practice in the same specialty as the defendant. Furthermore, the court found it significant that the plaintiff's expert was board certified in neurology and psychiatry, and that he frequently saw patients with psychiatric problems and referred them. The expert also stated that he kept up with the applicable standard of care through literature and training in psychiatry, and that he was familiar with anti-psychotic medications. *Id.* at 647–48. In light of that evidence, the appellate court held that the circumstances made the expert's testimony "relevant to the issues in the case." The grant of summary judgment was therefore re-

versed and the cause was remanded for trial. *Id.* at 648.

In each of these cases, the testimony of an expert physician specializing and practicing in another field was accepted as competent proof on the standard of care, so long as the expert had a sufficient basis on which to establish familiarity with the defendant's field of practice and the standard of care required in dealing with the medical care at issue. *See Goodman v. Phythyon,* 803 S.W.2d 697, 701–02 (Tenn. Ct.App.1990) (analyzing cases). In the instant case, the plaintiffs argue that the following facts in Dr. Engel's affidavit support a finding that his testimony would be relevant to the issues in the case:

- Dr. Engel is a board certified obstetrician-gynecologist who has training in obstetrics; he completed a preceptorship in Ultrasonography at the University of Colorado;
- He receives referrals (in gynecology and fertility) from obstetricians in small communities and is familiar with the standard procedures and practices of those obstetricians;
- He continues his education by attending Obstetric and Gynecology seminars and conferences;
- He works as an expert on the Tenn-Care Board reviewing obstetric records to determine whether certain procedures are insured, and he is, therefore, familiar with the standard of care for obstetricians in Tennessee and in communities similar to Gallatin;
- Through his service on the TennCare Review Board, he is familiar with the medical resources available to obstetricians in communities similar in size to Gallatin;
- He teaches as a clinical visiting associate at Emory University, Department of Gynecology and Obstetrics;

- He practiced as an obstetrician from 1974 through 1993;
- Since 1993, he has continued to practice medicine in the areas of general gynecology and fertility;
- He has served as a gynecology-obstetrics expert on the TennCare Medical Appeals Board since 1999.

Dr. Phillips argues that these facts are not sufficient, because testimony given by Dr. Engel in other cases confirms that, since 1993, he has only treated first-trimester and post-delivery patients, and that he has made a concerted effort to devote his practice exclusively to gynecology. Dr. Phillips also maintains that Dr. Engel's Tenn-Care experience does not establish any familiarity with the standard of care in obstetrics, because Dr. Engel's only role with TennCare is to review claims to determine whether they should be paid.

This case presents a very close issue. On these facts, however, we conclude that there is sufficient information to establish Dr. Engel's competence to testify on the issues in this case. It is significant that Dr. Engel is licensed in the same specialty as the defendant, and that he practiced in obstetrics for over twenty years. Although the focus of Dr. Engel's practice has shifted away from obstetrics to gynecology, he asserts that he maintains his knowledge about the standard of care in obstetrics through, among other things, teaching classes at Emory University and attending seminars and conferences on obstetrics and gynecology. *See Searle,* 713 S.W.2d at 64 (noting that there is no requirement that the expert's knowledge of the applicable standard of care "have been gained by treating patients in private practice"); *Ledford,* 742 S.W.2d at 647 (noting that plaintiff's expert was board certified in defendant's specialty and that the expert "kept up with literature" related to that specialty). Therefore, in our view, the fact

that Dr. Engel did not actually deliver babies in 2000 goes to the weight of his testimony, not its admissibility. *See Searle,* 713 S.W.2d at 64 ("The fact that Dr. Stratton does not see patients in private practice goes to the weight of the testimony rather than its admissibility."); *Stokes,* 651 S.W.2d at 706 (stating that the defendant's objections to the expert's testimony "must go more to the weight of the evidence rather than its admissibility"). Thus, because the "proof sufficiently meets the standards set out in the statute," we reverse the trial court's conclusion that Dr. Engel is incompetent based on the "practice" requirement of the statute. *See id.*

▬ Dr. Phillips also argued to the trial court that Dr. Engel did not meet the requirements of the statute because he did not show that he was familiar with the standard of care in the same or similar community as Gallatin, where the alleged malpractice occurred. In other words, Dr. Engel's affidavit did not satisfy the "locality rule." *See Howell v. Baptist Hosp.,* No. M2001–02388–COA–R3–CV, 2003 WL 112762, at *5 (Tenn.Ct.App. Jan.14, 2003); *Mabon v. Jackson–Madison County Gen. Hosp.,* 968 S.W.2d 826, 831 (Tenn.Ct.App. 1997); *see also Tilley,* 2002 WL 1000196, at *6. "Without this requisite threshold evidence of the standard of care in the locality, a plaintiff cannot demonstrate a breach of duty." *Mabon,* 968 S.W.2d at 831.

The trial court below did not address this issue. Dr. Engel's affidavit, however, sets out sufficient evidence to show that he was familiar with the standard of care either in Gallatin or in a similar community. In his affidavit, Dr. Engel states that, through his service on the TennCare review board, he has "become familiar with the medical resources available to obstetricians in communities similar in size to Gallatin," and he is "familiar with the

treatment, care and skill of practitioners in communities similar to Gallatin." Further, he states that he has reviewed literature and data regarding Gallatin, and he compares it with communities he claims are similar in size, namely Rome, Floyd County, Georgia, and Columbus, Muscogee County, Georgia. He asserts that, "[b]ecause of the referrals I receive from Muscogee County and Floyd County, I am familiar with the standard procedures and practices of obstetricians in Georgia communities similar to Gallatin.…" He also states that he is "familiar with the standard of care for obstetrics and gynecology in 2000 in Rome, Floyd County, Georgia," and that he is "familiar with the standard of care for obstetrics and gynecology in 2000 in Columbus, Muscogee County, Georgia." Finally, Dr. Engel states that he has visited hospitals in communities similar to Gallatin, and he has attended seminars where he further became familiar with the standard of care for obstetricians in communities similar to Gallatin.

In *Mabon,* the defendant physician practiced in Jackson, Tennessee. To establish the requisite standard of care under the statute, the plaintiff's expert stated in his affidavit that he was "familiar with the recognized standard of acceptable medical practice … in an area such as Jackson, Tennessee," and that "the standard of care in Jackson … would be comparable to the cities and facilities at which he had practiced medicine." *Mabon,* 968 S.W.2d at 828. From the expert's deposition testimony, however, it became apparent that he had no knowledge about Jackson's medical community, nor did he have any evidence on which to base his opinion that the standard of care in Jackson was the same nationwide. *Id.* at 830–31. The appellate court emphasized that the plaintiff has the burden of establishing the requisite stan-

dard of care in a medical malpractice action:

> It is the plaintiff who is charged with the burden of proof as to the standard of care in the community in which the defendant practices or in a similar community.... A plaintiff who chooses to prove the standard of care in a similar community necessarily must prove that community is similar to the one in which the defendant practices. To shift this burden to the defendant directly contradicts the plain language of the statute and would render the statute a nullity. Under the principles of summary judgment, once [the defendant] moved for summary judgment and submitted an affidavit stating that he complied with the standard of care in Jackson, the burden then shifted to [the plaintiff] to set forth specific facts that [the defendant] failed to meet the standard of care in Jackson or a similar community.

*Id.* at 831 (citation omitted). Because the plaintiff's expert did not set forth specific facts showing that he was familiar with the standard of care in Jackson, or that the standard with which he was familiar pertained to a community similar to Jackson, the court upheld the grant of summary judgment in favor of the defendant. *Id.* at 831.

In this case, Dr. Engel's affidavit contains information that was lacking in the affidavit scrutinized in *Mabon.* First, Dr. Engel sets forth statistical information about Gallatin and compares Gallatin to Rome and Columbus, Georgia, and describes information indicating that those communities are similar to Gallatin. He then sets out the basis for his familiarity with the standard of care in those communities, stating that he receives gynecological and fertility referrals from physicians in those communities, that he has reviewed medical records from hospitals from those communities, and that he has attended seminars and conferences that have familiarized him with the applicable standard of care in those communities. Thus, Dr. Engel has cited to "trustworthy facts or data sufficient to provide a basis for his opinion." *Tilley v. Bindra,* No. W2001–01157–COA–R3–CV, 2002 WL 1000196, at *6 (Tenn.Ct.App. May 13, 2002) (quoting *Church,* 39 S.W.3d 149, 166); *see Searle,* 713 S.W.2d at 64–65 (finding locality rule satisfied when expert indicated familiarity with the standard of care through his visits to hospitals in similar communities in his capacity as an educator). From the record before this Court, Dr. Engel's affidavit, viewed in a light most favorable to the Plaintiffs, satisfies the "locality rule" requirements of the statute. Accordingly, we reverse the trial court's grant of summary judgment in favor of Dr. Phillips. Other issues raised in this appeal are pretermitted.

The decision of the trial court is reversed and the cause is remanded for further proceedings not inconsistent with this Opinion. Costs are to be taxed to Appellee Robert Dabney Phillips, M.D., for which execution may issue, if necessary.