# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### November 18, 2005 Session

## TERESA A. CARPENTER v. TIMOTHY P. KLEPPER, ET AL.

**Appeal from the Circuit Court for Montgomery County**
No. 50200519     Ross H. Hicks, Judge

No. M2004-02951-COA-R3-CV - Filed March 16, 2006

Plaintiff filed a medical malpractice action against doctor and his employer. The jury returned a verdict in favor of Defendants. Plaintiff appealed the admission into evidence of expert testimony offered by two physicians under the locality rule and the award of certain discretionary costs. The judgment of the trial court is reversed and the case remanded for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL and FRANK G. CLEMENT, JR., JJ., joined.

R. Stephen Doughty and Alvin L. Harris, Nashville, Tennessee, for the appellant, Teresa A. Carpenter.

Robert A. Talley and Dennis P. Hawkins, Memphis, Tennessee, for the appellee, Timothy P. Klepper.

W. Scott Sims, Nashville, Tennessee, for the appellee, Premier Medical Group, P.C.

## OPINION

On August 8, 2002, Teresa A. Carpenter (Carpenter) filed a medical malpractice action against Timothy P. Klepper, M.D. (Klepper) and Klepper's employer, Premier Medical Group, P.C. (Premier), alleging that Klepper negligently performed laparoscopic surgical repair of her umbilical hernia during outpatient surgery in Clarksville, Montgomery County, Tennessee on November 2, 2001.

A jury trial of the action began on August 2, 2004. During the course of the trial, Klepper called expert witness, William S. Aaron, M.D. (Dr. Aaron) and Premier called expert witness, Eric J. DeMaria, M.D. (Dr. DeMaria) to testify as to the applicable standard of care and whether Dr.

Klepper deviated below that standard in his care of Carpenter. After voir dire examination of both experts, Carpenter objected that Drs. Aaron and DeMaria failed to meet the requirements of Tennessee Code Annotated, section 29-26-115, otherwise known as the locality rule. The trial court overruled Carpenter's objections and allowed Drs. Aaron and DeMaria to testify.

On August 6, 2004, the jury returned a verdict in favor of Defendants, finding that Dr. Klepper did not deviate below the applicable standard of care. On August 25, 2004, the trial court entered a judgment in favor of Defendants in accordance with the jury verdict. On September 24, 2004, Carpenter filed a motion for a new trial, asserting that the trial court erred in allowing Drs. Aaron and DeMaria to testify as expert witnesses for Defendants because neither expert met the requirements of the locality rule. On November 12, 2004, the trial court entered an order denying Carpenter's motion for a new trial.

On September 24, 2004, Premier filed a motion seeking discretionary costs of $19,927.46, however, counsel for Premier filed an affidavit on November 4, 2004, reducing the amount sought by $4,750.00. On October 4, 2004, Dr. Klepper filed his own motion for $16,930.48 in discretionary costs. Carpenter filed a memorandum in opposition to Defendants' motions for discretionary costs on October 26, 2004, arguing that Dr. Klepper's motion was untimely and both Defendants failed to demonstrate that the claimed fees were necessary and reasonable and were limited to fees charged for appearing at a deposition or trial.

The trial court entered an order on November 12, 2004, awarding Dr. Klepper $16,830.48 in discretionary costs and Premier $10,277.46 in discretionary costs. Carpenter filed a timely appeal. Carpenter asserts on appeal that (1) the trial court erred in admitting the testimony of Defendants' expert witnesses; (2) the erroneous admission of Defendants' experts' testimony more than likely affected the outcome of the trial; and, (3) the trial court erred in awarding certain discretionary costs to Defendants.

A trial court has broad discretion in determining the "admissibility, qualifications, relevancy and competency of expert testimony." *McDaniel v. CSX Transp.*, 955 S.W.2d 257, 263 (Tenn.1997). Questions regarding the qualifications of expert witnesses are left to the trial court's discretion and may be overturned only if that discretion is abused. *McDaniel*, 955 S.W.2d at 263. The Tennessee Supreme Court has defined an abuse of discretion to mean "an erroneous conclusion or judgment on the part of the trial judge – a conclusion that was clearly against logic (or reason) and not justified." *Foster v. Amcon Int'l, Inc.*, 621 S.W.2d 142, 145 (Tenn.1981).

Carpenter first contends that Defendants' experts, Drs. Aaron and DeMaria, failed to meet the requirements of Tennessee Code Annotated, section 29-26-115, which states in pertinent part:

(a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

(1) The recognized standard of acceptable professional practice in the profession and

the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn.Code Ann. § 29-26-115.

Carpenter argues that Dr. Aaron was not qualified under the locality rule because his knowledge of the applicable standard of care was based solely on his familiarity with statewide accreditation standards in Kentucky hospitals. Tennessee Code Annotated, section 29-26-115(a)(1) requires that a patient's expert in a medical malpractice case have knowledge of the standard of professional practice in the community where the defendant physician practices or in a similar community. *Robinson v. LeCorps*, 83 S.W.3d 718, 724 (Tenn.2002). "[I]t would seem rather difficult, if not impossible, to know the standard of care in a community without having any knowledge of the community in question." *Sandlin v. University Medical Center*, No. M2001-00679-COA-R3-CV, 2002 WL 1677716, at *6 (Tenn.Ct.App. July 25, 2002). This Court determined that a reasonable basis for an expert's knowledge of the medical community in question could consist of information such as the size, location, and presence of teaching hospitals in the community. *Sandlin*, 2002 WL 1677716, at *6. During direct examination, Dr. Aaron testified as to the number of beds at the Clarksville hospital, the medical technology available, and the proximity of the city to a larger metropolitan area. Clearly, Dr. Aaron's testimony established that he had some knowledge as to the medical community in Clarksville.

However, it is less clear whether Dr. Aaron established that he had knowledge of the standard of professional practice in a community similar to Clarksville. Experts must go further than simply asserting that they are familiar with the applicable standard of care. *Mabon v. Jackson-Madison County Gen. Hosp.*, 968 S.W.2d 826, 831 (Tenn.Ct.App.1997). Experts must present facts demonstrating how they have knowledge of the applicable standard of professional care in a similar community. *Spangler v. East Tenn. Baptist Hosp.*, No. E1999-01501-COA-R3-CV, 2000 WL 222543, at *1-2 (Tenn.Ct.App. Feb. 28, 2000). Dr. Aaron was admittedly unfamiliar with the standard of care in Clarksville, having practiced solely in Louisville, Kentucky. He asserted that he was, however, "intimately" familiar with the standard of professional practice in communities similar to Clarksville, having served on a federally mandated medical care quality assurance committee for the state of Kentucky which collected statistical information from participating hospitals and medical regions throughout the state, some of which had communities similar to Clarksville. Dr. Aaron testified:

Q.	What communities in Kentucky from a medical standpoint are similar to Clarksville that you're familiar with?

A.	Well, the hospital in Hopkinsville is the same size. Owensboro, one of the smaller Paducah hospitals, Shelbyville or Lexington hospitals are this size. There are community areas and most of the schools that used to be in the LVC. Bowling Green has a hospital that size. Richmond has a hospital that size, similar size, similar communities, and I'm intimately aware of what went on - what goes on on a day-to-day basis in the practice of medicine in a community like this and similar communities.

However during voir dire, Dr. Aaron revealed that he had no privileges in any of the hospitals which he had mentioned, nor had he lived in any of the cities he listed since he had been a medical doctor, nor had he ever treated a patient in any facility in the cities he listed. Dr. Aaron testified that he had operated in the Russell County and Adair County Hospitals, which are 100-bed hospitals, but that his last operation in those hospitals was seven or eight years ago. Dr. Aaron was then questioned as to how he had knowledge of the standard of care in these communities when he had never practiced in them. Dr. Aaron testified:

Q.	The job you have where - how did you become familiar with these hospitals and that they're like in Bowling Green, Hopkinsville, and Owensboro? Did you go out on the Internet and look them up?

A.	No, I didn't. I told you, for four years each participating hospital and medical region in the state of Kentucky submitted statistical information to the committee which I chaired.

Q.	Well, did they submit information about what their standards of care were for surgery?

A.	No, they didn't. I happened to be aware of what their standards of care are for surgery if they are accredited, and those hospitals are accredited.

Q.	And how do you know what their standards of care are for surgery if they are accredited?

A.	I'm aware of the joint commission on accreditation's policy and standards for accreditation.

Q.	Well, does that get as detailed as saying whether you need to close trocar sites in a laparoscopic ventral hernia procedure?

A.	No, it does not, and I don't know any hospital that has either policy or procedure that states that.

Q.	All right. So you wouldn't know from your job what the standard of care was in these communities was as far as whether surgeons close trocar sites or didn't close trocar sites?

A.	No, that's not correct. I do know what the standard of care for closure of trocar sites would be in any accredited institution in Kentucky because I am a surgeon. I'm familiar with those standards and I know how they are applied.

Q.	That's what I'm trying to find out, Doctor.

4

A.          Well, I'm answering you the best I can.

Q.          Other than knowing that they meet the standards for accreditation and other than knowing the statistics about them, how do you know what the standards are for surgeons in those communities as far as closing trocar sites?

A.          Standards are established much as words in the English language are established, by usages and by continuing medical education.

"For the purpose of Tenn.Code Ann. § 29-26-115(a), the only relevant 'community' is the community in the which the defendant physician actually practices or in a similar community." *Kenyon v. Handal*, 122 S.W.3d 743, 762 (Tenn.Ct.App.2003). "Accordingly, the courts have held that medical experts testifying for a patient in a medical malpractice case may not base their testimony solely on their familiarity with a national standard of professional practice." *Kenyon*, 122 S.W.3d at 762. Nor may expert testimony be based on a statewide, *Totty v. Thompson*, 121 S.W.3d 676, 678-79 (Tenn.Ct.App.2003), or even a regional standard of professional practice. *Howell v. Baptist Hosp.*, No. M2001-02388-COA-R3-CV, 2003 WL 112762, at *8 (Tenn.Ct.App. Jan. 14, 2003).

Dr. Aaron's testimony failed to demonstrate that his opinion regarding the applicable standard of professional practice was based on his knowledge of the standard of professional practice in a community similar to Clarksville. Dr. Aaron asserted that he was "intimately" familiar with hospitals of similar size and with similar communities as Clarksville, however, the only basis that he asserted for such knowledge was his position as the chairman of the Kentucky medical care quality assurance committee. He conceded that the information provided by the participating hospitals and medical regions did not include the standard of care for the individual institutions. Furthermore, he appeared to base his knowledge solely on national accreditation standards rather than on personal experience such as exercising privileges at the hospital in the relevant community, speaking with other surgeons in the relevant community about the standard of care in their community, or through referrals.

Although Dr. Aaron testified that he had treated patients from communities similar to Clarksville, he further stated that his care of those patients was no different than the care he provided to his regular patients in Louisville. Dr. Aaron testified:

Q.          Did you ever have patients – regular patients – surgical patients that saw you in a community similar to Clarksville?

A.          No. But I saw many from areas similar to Clarksville.

Q.          Well, the patients would come and they would come to Louisville to get treatment there; is that correct?

A.          Correct.

Q.          And you treated them – when you provided those people with surgery, it didn't matter to you if they were from Louisville or from Oxford, Mississippi, did it?

A          Correct.

5

Q.        So where they were from didn't make any difference in terms of the care you gave them?

A.        Correct.

Taken in its entirety, Dr. Aaron's testimony fails to establish the necessary elements of the similar locality rule.

Carpenter also asserts that it was error for the trial court to admit the testimony of Dr. DeMaria pursuant to the locality rule. Carpenter first claims that Dr. DeMaria failed to meet the requirements of the locality rule because he had not practiced surgery in a community similar to Clarksville in over a year prior to Carpenter's surgery. While the locality rule requires an expert to have "some knowledge" of the standard of care in a similar community, it does not require that the expert actually practice in that community to obtain such knowledge.

The testimony of Dr. DeMaria is couched in generalities. It is incumbent upon the party offering expert testimony under the locality rule to carry his burden of establishing the familiarity of the expert with the acceptable standard of professional practice in Clarksville, Tennessee, or in a similar community. As Dr. DeMaria had never been to Clarksville, Tennessee, prior to his testimony, it was necessary to establish his familiarity with the acceptable standard of professional practice in a similar community. As to this issue, he testified on direct examination:

Q.        Dr. Demaria, are you familiar with the standard of acceptable professional practice as it existed in November of 2001 in Clarksville, Tennessee, or a similar community, with respect to the performance of a laparoscopic ventral hernia repair?

A.        I think I am, yes.

Q.        How are you familiar with the standard of care?

A.        Well, during my tenure in Richmond, I've practiced in community hospitals outside of the city. I actually live in a county outside of Richmond that's about the same size as Montgomery County here.

I have worked in several 200-bed - - approximate size - - hospitals in the Virginia area and have done laparoscopic surgery in those hospitals on a number of occasions.

I've also traveled in my role as a teacher to numerous communities that are very similar to this in other states. I've been to West Virginia within the past six, eight month. I've been to a small town in upstate Pennsylvania several times to assist in surgery and to help surgeons who work there to learn laparoscopic procedures.

MR. SIMS: Your Honor, at this time, we would tender Dr. Demaria as an expert in laparoscopic ventral hernia repair.

MR. DOUGHTY: We object. Lack of foundation.

THE COURT: Do you wish to voir dire on foundation?

MR DOUGHTY: Yes.

6

Dr. DeMaria was chief of general surgery and professor of surgery at the University Medical College of Virginia located in Richmond, Virginia. He is a fellow of the American College of Surgeons and performs laparoscopic surgery at the University of Virginia Hospital three days per week. The University Hospital is a major medical center of about 600 beds serving a metropolitan area of some 800,000 to 900,000 people.

Relative to his familiarity with communities similar to Clarksville, Tennessee, he testified on cross examination:

Q.      You mentioned that you practiced in a couple of suburban hospitals there as well as practicing at the university hospital?
A.      Yes.
Q.      Is Johnson-Willis Hospital one of them?
A.      Right.
Q.      And Chippenham Medical Center?
A.      Right.
Q.      Those are both in Chesterfield County?
A.      Yes, sir.
Q.      How far are they from your office in – –
A.      Johnson-Willis is fairly far out in the county. It's probably about 20 miles from downtown.
Q.      20 miles from downtown Richmond?
A       Yes.
Q.      When you were practicing there, you continued to practice also in Richmond. That was your main job – – right? – – at the university hospital?
A.      Yes.
Q.      It's been three or four years since you've practiced at those two facilities, hasn't it?
A.      Since I maintained an office – – we had an office at the community hospitals for three or four years and abandoned that ultimately three or four years ago. But I remain on the courtesy staff for most of the hospitals in the area.
Q.      Tell us what you know about Clarksville.
A       What I know about Clarksville is that today is the first time I've been here, but it's a much smaller town obviously than Nashville, which is where I flew into yesterday. But that's a pretty good size city. It took us about 45 minutes to get here.

I know there's information – – I think Dr. Black had provided a supplement that I looked at that says that Montgomery County has about 135,000 people. I think I mentioned before that I know about the hospital, the size of the hospital, its capabilities, and so forth.
Q.      Tell us what you know about the hospital. Which hospital are you talking about? Gateway?
A.      Yes.

7

Q.			What do you know about it?

A.			That it's about 200 or so beds. They have an emergency room. They have cancer treatment. They have most of the standard specialties represented. I think they have about 150 staff physicians with privileges there.

Q.			Which community are you saying that you know of that is similar? You have never practiced in Clarksville and never been here until today. You don't know any doctors in Clarksville, do you?

A			I don't think I know any doctors in Clarksville, no.

Q.			You don't have any firsthand familiarity with the standard of care in Clarksville per se, do you?

A.			Since I've been here exactly one time today, I don't have that type of firsthand experience. But I think my point was that I have, you know, encountered other situations that are very similar in both my own local environment in Virginia, knowing physicians who worked in smaller hospitals working with them on a regular basis, as well as traveling to numerous smaller hospitals, having a chance to develop relationships with surgeons, physicians. I offer courses at our institution. We have many surgeons travel to Richmond where we have several days of interaction, and so forth.

Q.			Tell me the name of a community you say is similar to Clarksville.

A.			Meaning a town?

Q.			A community.

A.			I think I mentioned my county as being similar to Montgomery County, which I understand where Clarksville is. We have towns within our county in the county of Hanover, Virginia, which is where I live. Mechanicsville is the town that I live in.

Q.			Do you practice in Hanover County?

A.			I don't have an office in Hanover.

Q.			Do you have privileges at a hospital?

A.			I have courtesy privileges at the hospital in Hanover County.

Q.			How big is that hospital?

A			That hospital is about 120 beds, I think. It's called New Hanover Regional Medical Center.

Q.			You don't do surgery there, do you?

A.			No, I don't. We had had an office there that one of my partners visited very often up until he left about a year ago. I did not myself go out there.

Q.			What particular community or town in Hanover county are you saying is similar? The whole county?

A			No. The town I live in, Mechanicsville, which is the most populated town – – I don't even know if you're supposed to call it a town. It's a small city.

Q.			Is that where the hospital is?

A.			Yeah.

Q.			The one that you have never done any surgery in. Is that right?

A.			Correct.

8

Q.        What other community do you say is similar to Clarksville?

A.        Well, the hospital, Johnson-Willis Hospital, that I mentioned before is in, I guess you would call it a town in Chesterfield County called Medlothian. Midlothian is sort of a major population center for Chesterfield county where that hospital is located.

Q.        That's the hospital you said it takes you about 20 minutes to get there?

A.        Well, it's about 25 miles and there's no highway that goes there. It takes a bit longer than 20 minutes, unfortunately.

Q.        It's been three or four years since you did any surgery there, hasn't it?

A.        Yes, sir.

Q.        Has it been closer to four years?

A.        It's probably about four years. I run a laparoscopic training program where I have three fellows. They go out there every week and work with one of the doctors that we trained at MCV, who I talk to on a regular basis. He is out there full-time.

Q.        Let me ask you, the community of Chesterfield County where Johnson-Willis is and Chippenham, that community has two hospitals. One of them is Chippenham. It has 466 beds. Is that right?

A.        Chippenham Medical Center?

Q.        Yes.

A.        I think that statistic probably represents a combination of the two hospitals.

Q.        Doesn't Johnson-Willis Hospital have 282 beds on its own?

A.        I know they put a new addition on in the last two years. That's probably enlarged it quite a bit.

Q.        Wouldn't you agree the Chippenham Center there in Chesterfield County is a level 3 trauma center?

A.        I suppose they call themselves a level 3 trauma center. Frankly, it seems to me to be mostly a marketing ploy. I should comment that Chippenham Medical Center just opened a new building. I suspect they have a fair number of beds. It's a cardiac surgery center. It wasn't there when I was working there three, four years ago.

Q.        So now that they have expanded, they have a cardiac treatment center there?

A.        They built a building for cardiac surgery.

Q.        You don't dispute that they are a level 3 trauma center?

A.        I guess they are. I don't remember what the definitions of a level 3 trauma center is.

Q.        In any event, it's been four years since you practiced at either one of those hospitals, isn't it?

A.        Yes.

Q.        You practice now mostly at the teaching hospital there. Is that right?

A.        The vast majority of my clinical practice is in that center, yes.

MR. DOUGHTY: Your Honor, we would object to the qualifications of the witness.

The trial court overruled objections to the qualifications of Dr. DeMaria under the locality rule and allowed him to testify.

The burden of the party offering testimony is the same under the similar locality rule regardless of whether the witness is offered by the plaintiff or the defendant. In this context, this Court has held:

> It is the plaintiff who is charged with the burden of proof as to the standard of care in the community in which the defendant practices or in a similar community. T.C.A. § 29-26-115(a)(1). A plaintiff who chooses to prove the standard of care in a similar community necessarily must prove that community is similar to the one in which the defendant practices. To shift this burden to the defendant directly contradicts the plain language of the statute and would render the statute a nullity. Under the principles of summary judgment, once Dr. Thomas moved for summary judgment and submitted an affidavit stating that he complied with the standard of care in Jackson, the burden then shifted to Mabon to set forth specific facts that Dr. Thomas failed to meet the standard of care in Jackson or in a similar community.

*Mabon*, 968 S.W.2d at 831.

Establishing the similarities in communities is as much a part of the burden of proof under the locality rule as is establishing that the witness practices in a contiguous state. *Bravo v. Sumner Reg'l Health Sys, Inc.*, 148 S.W.3d 357, 368-69 (Tenn.Ct.App.2003). The testimony offered by Dr. DeMaria in this case stands in stark contrast to that offered by Dr. Engel in *Bravo*. After testifying that he was a member of the Tennessee Bureau of TennCare Medical Services Appeal Board, Dr. Engel testified:

> . . . I have reviewed geographical data, statistical data and literature concerning Gallatin . . . and Sumner Regional Medical Center. I know that in 2000, Gallatin, Tennessee had a population of approximately 23,230 and that Sumner County had a population of approximately 130,449. I know that Sumner Regional Medical Center is a not for profit facility with 155 bed capacity with over 700 staff employees and over 100 physicians. Sumner Regional Medical Center delivered approximately 756 babies in 2001 and treats over 25,000 patients per year in their 24 hour a day Emergency Room. Further, Sumner Regional Medical Center is 32 miles or approximately a 45-minute drive from Vanderbilt University Medical Center, a leading medical complex and teaching hospital. Sumner County, Tennessee has three (3) general medical surgical hospitals.

10

Based on this and other information, I am familiar with the medical resources available to the medical community in Gallatin, Sumner County, Tennessee. I am familiar with the standard procedures and practices of obstetricians in communities similar in size to Gallatin, Sumner County, Tennessee.

*Bravo*, 148 S.W.3d at 361.

Defendant simply has not carried its burden of proof that the outlying communities near Richmond, Virginia, are similar communities to Clarksville, Tennessee. Dr. DeMaria does not qualify as an expert witness under the similar locality rule, and his testimony is not admissible.

The legislatively mandated "similar locality rule" has long since outlived its usefulness. It developed as an improvement over the "strict locality rule" which was grounded in the manifest inequality existing in remote history between physicians practicing in large urban centers and those practicing in remote rural areas. Rapid advances in medical education, means of communication, and both invasive and diagnostic technology have rendered the "similar locality rule" of today as obsolete as the "strict locality rule," which it legislatively supplanted in 1975. *Totty*, 121 S.W.3d 676.

There is no basis in logic or reason why the testimony of both Dr. Aaron and Dr. DeMaria is not admissible into evidence in this case. We are, however, powerless to do anything other than to engage in the tedious exercise of hair-splitting manifested both in this case and in the recent case of *Travis v. Ferraraccio et al.*, 2005 WL 2277589, No. M2003-00916-COA-R3-CV (Tenn.Ct.App. Sept. 19, 2005). We can only once again follow the lead of the Supreme Court of Tennessee in *Robinson*, 83 S.W.3d at 723-24, and implore the Legislature to relegate the "similar locality rule" to the "ash heap" of history. *Street v. Calvert*, 541 S.W.2d 576, 583 (Tenn. 1976).

As both expert witnesses for Defendants have failed to meet the requirements of the locality rule, the judgment of the trial court will be reversed and the case remanded for a new trial on all issues.

In the interest of judicial efficiency, we will address the other issues presented on appeal, which issues are determinable from this record, in the event that we are in error in excluding either one or both of Defendants' experts under the similar locality rule.

Rule 36(b) of the Tennessee Rules of Appellate Procedure states:

(b) Effect of Error. A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.

11

Tenn.R.App.P. 36(b).

There is little practical difference between the testimony of Dr. Aaron and the testimony of Dr. DeMaria in this case. Appellees assert that since the testimony is essentially cumulative, if one expert's testimony meets the locality rule and one does not, the resulting error in admitting into evidence the testimony of the non-qualifying expert is harmless error. Appellant takes the view that while the result reached by each of the experts is the same, their reasoning and methodology differ and we are not dealing with cumulative testimony. Such question requires careful analysis of the testimony of both physicians.

"It is well established that if erroneously admitted evidence is merely cumulative of other evidence presented in the case, its admission does not constitute reversible error." *State v. Torres*, 858 A.2d 776, 792 (Conn.Crim.Ct.App.2004) (citing *State v. Calerdon*, 82 Conn.App.315, 326, 844 A.2d 866, cert. denied, 270 Conn. 905, 853 A.2d 523 (2004)). However, "[w]hile the erroneous admission of cumulative evidence can be harmless, 'harmless error' is a more difficult case to make when the testimony is not that of a fact witness, but instead is expert testimony." *Tetrault v. Fairchild*, 799 So.2d 226, 228 (Fla.Dist.Ct.App.2001).

In *Durflinger v. Artiles*, 727 F.2d 888 (5th Cir.), decedents' husband and father brought a wrongful death action against the hospital and physicians who participated in the decision to discharge a patient who thereafter killed plaintiff's wife and son. Defendants challenged the trial court's admission of the deposition of Dr. Moore, the director of the Mental Health Institution charged with evaluating the patient, claiming that the testimony was based on facts not within Dr. Moore's personal knowledge. *Durflinger*, 727 F.2d at 892. The court found the admission harmless error, if any, stating:

> The record is not clear whether Dr. Moore was an expert witness or merely a lay witness to certain facts at issue in the case. The standards applied to lay and expert witnesses differ.
> ...
> In their brief, defendants suggest that Dr. Moore is to be treated as an expert. If this is so, then his conclusions based in part on data and reports prepared by Dr. Strange, a psychologist colleague, in reaching a conclusion on [the patient's] condition and prognosis was properly in evidence. He could and did reasonably rely on this information in forming his professional opinion. *Aircrash*, 684 F.2d at 1314 (9th Cir.) (expert permitted to testify on pilot competence based on flight training records).
>
> If Dr. Moore served as a lay witness, the deposition testimony should have been limited to his conclusions based on his own observations. The conclusions based on Dr. Strange's observations should have been excluded. This possible error in the trial judge's ruling, however, does not require reversal of this case. "Even if there is error,

12

reversal is appropriate only if we can say that the error affected the substantial rights of the parties." *Aircrash*, *supra* at 1313; Fed.R.Civ.P. 61. No substantial rights were affected by this alleged error. Dr. Strange testified at trial on the same issue as Dr. Moore's deposition testimony ... The evidence challenged here was cumulative at worst, and did not substantially damage defendant's case.

*Durflinger*, 727 F.2d at 892-893.

In *Carr v. Ingle*, 395 P.2d 650 (Okla.1964), an automobile passenger brought an action against the owner of a truck and the insurer for injuries sustained to her neck and spine when the automobile in which she was riding was struck by the truck. Defendants argued that the trial court erred in the admission of incompetent medical testimony. Finding that the admission constituted only harmless error, the court stated:

> Next, the defendants complain the trial court erred in the admission of incompetent medical testimony. The trial court permitted in plaintiff's case in chief plaintiff's counsel to ask questions of Dr. M, and osteopath and a specialist in orthopedic and neurological surgery, which was based upon a medical book by Dr. Reed Catlett, M.D., Professor of Medicine, University of Southern California. The gist of what was read was that a patient with a 'herniated lumbar disc presents a history of pain running down his leg originating either in the region of the low back or other lower extremities.' The reading continued in substance was further to the effect 'the pain was due to nerve irritation and the sensation is referred down the leg, usually distributed in the posterior thigh, the calf, heel and into the toes.' To this reading Dr. M agreed such would be the case. He could hardly do otherwise since his testimony was in all particulars substantially identical to the matter read form the book. The vice of this procedure is readily apparent. From a legal standpoint it is rank hearsay produced by counsel from an author's available textbook and through the medium of interrogation he thus presents the testimony of the author given as it was written, without the particular situation in mind or the sanction of an oath, and without the vouchsafed author being liable to cross examination, in denial of the precedent rights of sequestration of the author as a witness and confrontation of him from the witness stand. For these reasons and other reasons the trial judge erred in permitting counsel for plaintiff to read to his doctor, or any doctor appearing as a witness, from the textbook in question. 32 C.J.S. Evidence § 718, note 94, p. 628.

> In this connection, however, the record discloses that not only Dr. M testified for the plaintiff in keeping with the text material, but Dr. P. W did also, in substance.

> Dr. F. B's testimony for the plaintiff was in keeping with the text read from to the effect that a displacement of the disc material creates direct pressure on the spinal cord, and nerve roots, giving symptoms of pain and numbness down the leg. Moreover, Dr. McD for the defense, on cross examination, testified in substance that

a ruptured intervertebral disc as a result of trauma puts pressure on the nerve roots, leading into the lower extremities resulting in a numbness thereof, as the result of either acute or chronic trauma, with a wasting away in the lower extremities. In this connection, Dr. P. W specifically testified that he found the left calf of Mrs. Ingle's leg to be 'one-half inch smaller than the right.' He also tesified that Mrs. Ingle complained of lower back pains and pain in the lower extremities. The record herein conclusively shows that the matter read from the text was cumulative and was not reversible error, under Clinton & O. W. Ry. Co. v. Dunlap, 75 Okla.64, 181 P. 312, holding:

> 'While there are some authorities to the contrary, we agree that, according to the great weight of authority, this method of examination was improper, and the excerpts from the text were inadmissible, but our examination of the record discloses that this evidence was merely cumulative.'

> We are, therefore, in the final analysis, of the opinion this testimony, under the conditions herein presented, while error, was not injurious under the conditions existing in this case. It has been repeatedly held by all authorities that error without injury is not reversible.

*Carr*, 395 P.2d at 653-654.

In order to determine whether Dr. Aaron and Dr. DeMaria's testimonies were cumulative, we must compare their testimonies on the determinative issues in this case. There were essentially four issues that Appellees' expert physicians testified as to, including whether the length of the surgery violated the standard of care, whether the decision not to convert to an open procedure violated of the standard of care, whether Dr. Klepper had adequate visualization to proceed with the surgery laparoscopically, and whether the standard of care requires surgeons to close all 10-millimeter trocar sites.

With regard to the length of the surgery, Dr. Aaron testified:

Q.    All right. Let's talk about some standards of care. Dr. Black, the plaintiff's expert – the plaintiff's witness, has offered the opinion that Dr. Klepper deviated from the standard of care because of the length of time involved in the surgery. Are you aware of that opinion?
A.    I am.
Q.    Do you agree with Dr. Black's opinion?
A.    No, I don't agree with him.
Q.    Why not?
A.    Because some things take longer than others. The measurement of time and how long things take does not in any way relate to the quality of the outcome.

14

It's a measurable thing. There is not indication from my review of the operative report that time was a factor – a deleterious factor in any part of what went on in the operating room or what happened later.

Dr. DeMaria also testified as to the length of the surgery stating:

Q. Okay. Fair enough. Let me ask you about the length of this surgery. Is the fact that this laparoscopic procedure went on for 11 hours a deviation from the standard of care?
A. I don't think it was a deviation, no.
Q. What is the appropriate length of a laparoscopic ventral hernia repair?
A. The length of the surgical procedure really depends on the cards you're dealt as the surgeon doing the operation. Procedures can be shorter when things go well and they're easy and longer when there are technical challenges. That's not something that's unique to laparoscopic surgery, that's just surgery.
I think – in my experience, it usually takes a couple of hours to do a laparoscopic hernia repair like an umbilical hernia. But when things get difficult, it can take longer.

Dr. Aaron's testimony also included his opinion about Dr. Klepper's decision not to convert to an open procedure. Dr. Aaron testified:

Q. Dr. Black has suggested that because of – Dr. Black opines that Dr. Klepper deviated from the standard of care for Clarksville by failing to convert this procedure to an open procedure. Do you agree with Dr. Black?
A. No, I do not.
Q. Why not?
A. There are no set guidelines on this. It's a matter of surgical judgment as to when to do any of these things. It's always a possibility in a surgeon's mind that when you weigh the risks and the benefits of any situation at any point in time you have to consider that. And I read in his operative report note where he mentioned that, that he considered that at certain points but felt that for the patient's benefit which would be that when the work was done she could basically not have all the morbidity, the sickness, and things associated with an open procedure, and he was – trying to avoid that.

Dr. DeMaria's also testified as to the decision not to convert to an open procedure, stating:

Q. Doctor, do you question or ascribe any blame to Dr. Klepper's judgment in not converting to an open procedure here?
A. No.
Q. Tell us why.

15

A.     Well, the risks of open conversion are not negligible here. We've already talked a little bit about infection. We've talked about how doing an open is not a, you know, we'll be done in 20 minutes approach. It's going to take basically starting over in some ways to get this case done.

Whether Dr. Klepper had enough visualization to proceed laparoscopically was also an issue in the case to which Dr. Aaron testified:

Q.     In your review of the records or any of the depositions, is there any – is there anything in those records which gives you the opinion that Dr. Klepper ever proceeded with the surgery when he was not able to see what he needed to sew?
A.     No. And in the nurses' depositions that I read there was no indication that anybody else who has a responsibility to be a patient advocate ever noticed anything like that happening during the operation.

Dr. DeMaria also testified as to this issue, stating:

Q.     Did you see any evidence that Dr. Klepper operated when he could not see?
A.     My opinion is that a great amount of the time required for this procedure was in fact, waiting; waiting to see adequately and to be sure injury didn't occur. That's appropriate laparoscopic technique.
Q.     Did you see any evidence that he proceeded when he could not see?
A.     No.

The final issue in the case was whether the standard of care in Clarksville required surgeons to close all 10-millimeter trocar sites. As to that issue, Dr. Aaron testified:

Q.     Doctor, does the standard of care for Clarksville or a similar type community require a general surgeon to always close a 10-millimeter trocar site?
A.     No, it does not.
Q.     Can you explain to the jury under what circumstances you don't?
A.     I would say while there is some judgment – clinical judgment involved in it, that most people in similar circumstances, similar community have learned that we need to close things where only one layer – one layer is involved. If you go through the side with an instrument, you go through three different muscle layers, and believe me, we're beautifully and wondrously made by our maker. And it's much like a lap strake or much like the linings on steel-belted radials. You'll have the grains going one way in one muscle layer and the next muscle layer is like that and then the next muscle layer is at the right angle to those.
       So on our flank just a little over on the side these 10 millimeter trocars were put, it's an automatic protective mechanism that when those things close like

16

that and those close like that and then the others close like that, that ordinarily a suture is not required. It's not like you've got a Swiss cheese hole all the way through that you can see they close.

Regarding the same issue, Dr. DeMaria testified:

Q. Let's talk about with respect to a patient like Ms. Carpenter with the equipment to your knowledge that was used by Dr. Klepper. What would the standard of care require regarding closure of 10-millimeter trocar sites?

A. My view is that the standard of care does not mandate closure of 10-millimeter trocar sites. It depends where they are in the abdomen. Trocar sites placed out laterally in the abdomen out to the sides or way up near the top of the abdomen usually don't have to be closed. The trajectory of the trocar insertion has to do with whether or not you need to close the site.
In other words, this abdominal wall in this patient was very thick. There was a lot of space between the skin and the inside abdomen. Well, if you put your trocar straight at a straight angle right through that, then you're going to have a short distance and theoretically more chance for herniation.
...

Q. I think you just said that the standard of care does not require closure of 10-millimeter trocar sites placed toward the outside or laterally from the belly button?

A. Right.

Q. Okay. What's your understanding about where the 10-millimeter trocars were placed in this case?

A. They were out laterally.

Q. Why, when a 10-millimeter trocar site is out laterally, does it not need to be closed?

A. Because the angle into the abdomen is usually such that the abdominal wall collapses on that tract that's created rather than leaving the tract open.

Q. Can you explain that a little more? Does it have to do with the musculature or the –

A. It has to do with the skin location of the incisions versus where the trocar actually enters the abdominal cavity. In other words, the further that distance is, the more angled the insertion, the more tangential, the more – when you pull it out, the layers tend to collapse upon themselves and make herniation more difficult.

It is clear that the testimonies of Dr. Aaron and Dr. DeMaria were essentially identical as to the pertinent issues in the case. Therefore, if one of Defendants' expert's testimony meets the locality rule, and one does not, the resulting error in admitting into evidence the testimony of the non-qualifying expert would be harmless error.

17

The final issue Carpenter raises on appeal concerns whether the trial court erred in the award of certain discretionary costs to Defendants. Pursuant to Rule 54.04(2) of the Tennessee Rules of Civil Procedure, a trial court may award a party who prevails in litigation reimbursement for certain enumerated costs, including "reasonable and necessary court reporter expenses for depositions or trial, [and] reasonable and necessary expert witness fees for depositions or trials." Tenn.R.Civ.P. 54.04(2). The party seeking to recover discretionary costs bears the burden of demonstrating that it is entitled to recover such costs. *Stalsworth v. Grummons*, 36 S.W.3d 832, 835 (Tenn.Ct.App.2000). Such awards should be upheld on appeal so long as the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable. *Bogan v. Bogan*, 60 S.W.3d 721, 733 (Tenn.2001). However, the party challenging the award on appeal has the burden of showing how the trial court abused its discretion. *Sanders v. Gray*, 989 S.W.2d 343, 345 (Tenn.Ct.App.1998).

This Court noted in *Mass. Mut. Life Ins. Co. v. Jefferson*, 104 S.W.3d 13, 36 (Tenn.Ct.App.2002), that proceedings involving discretionary costs are primarily determined on the affidavits and arguments of counsel in light of the entire record, and evidence beyond the competing affidavits is rarely presented during the hearing. The Court went on to state:

> [F]ully developed records of contested proceedings involving costs under Tenn. R. Civ. P. 54.04(2) are rare and are certainly not required to enable the trial court, or an appellate court for that matter, to review a claim for discretionary costs. In cases where the issue of discretionary costs has been decided on affidavits and the record of the entire proceeding without the presentation of new evidence specifically pertaining to the disputed costs themselves, the trial court's decision can effectively be reviewed without a transcript of the hearing on the Tenn. R. Civ. P. 54.04(2) motion. Accordingly, parties challenging a trial court's decision regarding discretionary costs are not necessarily required to submit a transcript of the hearing on discretionary costs in order to raise the issue on appeal.
>
> Other panels of this court have held that they will presume that the evidence supports a trial court's decision regarding discretionary costs in the absence of a transcript or record of the hearing on discretionary costs. *Luna v. Breeding,* No. M2000-01932-COA-R3-CV, 2001 WL 950187, at *3 (Tenn.Ct.App. Aug.22, 2001) (No Tenn. R.App. P. 11 application filed); *Faux v. Spears,* No. 03A01-9312-CV-00433, 1994 WL 147830, at *1 (Tenn.Ct.App. Apr.26, 1994) (No Tenn. R.App. P. 11 application filed); *Moser v. Bibee,* No. 03A01-9209-CV-00347, 1993 WL 133292, at *1 (Tenn.Ct.App. Apr.28, 1993) (No Tenn. R.App. P. 11 application filed). We decline to apply this appeal-ending presumption unless the record affirmatively shows that the trial court's decision regarding discretionary costs was based on evidence other than the parties' affidavits and the record as a whole.

*Mass. Mut. Life Ins. Co.*, 104 S.W.3d at 36-37.

The Court found that because the trial court's order denying plaintiff's motion for discretionary costs did not affirmatively state that the court heard additional evidence regarding discretionary costs at the hearing, the Court did not need a transcript of the hearing in order to review the trial court's decision and the presumption that the evidence presented during the hearing supported the trial court's decision was not applied. *Mass. Mut. Life Ins. Co.*, 104 S.W.3d at 37.

In this case, the trial court's order stated:

> This matter came before the Court on November 4, 2004, for a hearing on motions by both defendants for an award of discretionary costs pursuant to Tenn. R. Civ. P. 54.04(2). Considering the motions, plaintiff's opposition to the motions, and the arguments of counsel at the hearing, together with all the papers and pleadings filed in this action, the Court finds that the motions should be granted in part and denied in part. The Court finds that defendant Dr. Klepper is entitled to receive all the costs he had requested, except for the $100.00 charge for the videotape of his deposition. The Court finds that defendant Premier Medical Group, P.C. is entitled to receive all of the costs it has requested, except for the $100.00 charge for the videotape of Dr. Klepper's deposition, $4750.00 in preparation charges from Dr. DeMaria, and $4,800.00 in testimonial charges from Dr. DeMaria relating to the mistrial in January.

Similar to the trial court's order entered in *Mass. Mut. Life Ins. Co.*, the order in this case failed to affirmatively state that the trial court's decision regarding discretionary costs was based on evidence other than Dr. Klepper and Premier's motions, Carpenter's opposition to the motions, the arguments of counsel, and the record as a whole. Therefore, review of this issue is not precluded by the failure to provide a transcript of the hearing and we review the matter without the presumption that the evidence presented during the hearing supported the trial court's decision.

It is Carpenter's contention that the trial court erred in the award of certain discretionary costs to Defendants because Defendants failed to clearly explain their expert witness fees for Drs. Aaron, Gelfand, and DeMaria, and because Defendants failed to explain the basis for transcribing the trial transcript. Carpenter does not appeal the award of discretionary costs associated with any other court reporter expense. Both Defendants attached an itemization of expenses to their motions for discretionary costs, however, Dr. Klepper failed to sumbit an affidavit of grounds as required by Rule 54.04(2). Dr. Klepper's attachment to his motion provided:

<u>COURT REPORTER FEES</u>

| DATE | PAYEE | AMOUNT | DEPOSITION |
|------|-------|--------|------------|
| 01/28/03 | Vowell & Jennings | $741.00 | Teresa Carpenter |
| 03/18/03 | Julianne M. Vestal | $182.00 | Barbara Seay |

| 03/18/03 | Julianne M. Vestal | $119.00 | Cindy Tubberville |
|----------|-------------------|---------|-------------------|
| 03/18/03 | Julianne M. Vestal | $143.50 | Charles Miles |
| 03/18/03 | Julianne M. Vestal | $ 87.50 | Myra Ishee |
| 03/18/03 | Julianne M. Vestal | $112.00 | Bittney Merchant |
| 03/18/03 | Julianne M. Vestal | $ 29.75 | Ashley Carpenter |
| 04/17/03 | Christina Meza Rhode | $ 74.74 | Dr. Preacher |
| 04/30/03 | Julianne M. Vestal | $ 85.50 | Joleen Moe |
| 04/30/03 | Julianne M. Vestal | $ 99.75 | Karen Keen |
| 05/06/03 | Verbatim Reporting Serv. | $ 78.25 | Kathy Ditto |
| 05/06/03 | Verbatim Reporting Serv. | $ 81.75 | Dr. F.B. Pease, Jr. |
| 05/12/03 | Vowell & Jennings | $ 99.25 | Jessie R. Bailey |
| 06/03/03 | VCE, INC. | $100.00 | Dr. Timothy Klepper |
| 06/12/03 | Coastal Court Reporting | $114.83 | Lynne Meyer |
| 07/21/03 | Catherine Shay | $243.00 | Dr.William Aaron |
| 08/08/03 | Julianne M. Vestal | $160.70 | Jennifer Hines & Dave Celeski |
| 08/12/03 | Verbatim Reporting | $138.50 | Dr. Jeffrey C. Wilson |
| 08/25/03 | Vowell & Jennings | $ 88.00 | Vernon Carrigan, MD |
| 08/25/03 | Vowell & Jennings | $207.10 | Robert McCorkle |
| 08/25/03 | Suncoast Reporting Serv. | $167.10 | Bonnie M. Ferguson |
| 09/02/03 | Alpha Reporting Corp. | $ 53.00 | Dr. M. Gelfand |
| 09/04/03 | Cook & Wiley, Inc | $ 86.25 | Dr. Eric DeMaria |
| 10/22/03 | Video South-Videographer | $375.00 | Dr. M. Gelfand |
| 11/07/03 | Vowell & Jennings | $471.90 | Dr. T. Klepper |
| 03/15/04 | Marci Hooten | $218.50 | Dr. M. Gelfand |
| 07/19/04 | Vowell & Jennings | $274.98 | Dr. Jeffrey Larsen |
| 07/23/04 | Action Court Reporters | $158.00 | John Tarr |
| 07/27/04 | Bragan Reporting Assoc. | $ 95.32 | Julie Buros |

### EXPERT WITNESS FEES

| 10/20/03 | Dr. M. Gelfand | $1500.00 |
|----------|----------------|----------|
| 09/23/04 | William S. Aaron, M.D. | $10,544.00 |
| TOTAL: | | $16,930.48 |

In *DePriest v. 171-19 West End Assoc.*, 951 S.W.2d 769, 775 (Tenn.Ct.App.1997), this Court reversed the trial court's award of discretionary costs provided by Rule 54.04(2) of the Tennessee Rules of Civil Procedure to defendants because of their failure to support their motion with a sufficient affidavit of grounds. The defendants' motion merely stated, "OSR Defendants seek to tax discretionary costs pursuant to Tule 54.04(2), T.R.C.P. The amount of those discretionary costs is

20

$11,594.59, plus fees of A. Neal Graham, Plaintiffs' expert witness." *DePriest*, 951 S.W.2d at 774. Finding the defendants' affidavit deficient, the Court noted that the affidavit supporting the motion stated only the tie spent and the charges therefor. *DePriest*, 951 S.W.2d at 774. Similarly, in this case, Dr. Klepper failed to submit any affidavit supporting his motion and the exhibit to his motion merely listed the names of his experts, a date, and an amount. We therefore reverse the trial court's award of expert witness fees to Dr. Klepper.

While Premier complied with the affidavit requirement of Rule 54.04(2), neither the motion, the exhibit to the motion, nor the affidavit provided a sufficient explanation of which of the many fees listed for Dr. DeMaria represented his fee for attending the trial. Premier's attached exhibit provided:

<u>EXHIBIT A</u>

| | | |
|---|---|---|
| 02/28/03 | Depositions of Timothy Klepper and Teresa Carpenter | $ 749.60 |
| 02/28/03 | Video Deposition of Timothy Klepper | 100.00 |
| 03/17/03 | Expert fee retainer for Eric DeMaria, M.D. | 800.00 |
| 05/09/03 | Depositions of Myra Ishee, Karen Keen, Britney Merchant, Barbara Seay, Charles Miles, Joleen Moe, Cindy Tubberville and Ashley Carpenter | 480.00 |
| 05/23/03 | Deposition of Bonnie Ferguson | 167.10 |
| 05/23/05 | Deposition of Lynne A. Meyer | 114.00 |
| 06/27/03 | Expert fee for Clifford Black, Jr., M.D. | 875.00 |
| 08/04/03 | Depositions for Jennifer Hines and Dave Celeski | 160.70 |
| 08/12/03 | Expert fee for Dr. DeMaria, M.D. | 4,800.00 |
| 10/31/03 | Deposition of Michael Gelfand, M.D. | 64.75 |
| 01/07/04 | Expert fee for Eric DeMaria | 650.00 |
| 01/09/04 | Deposition of Bob McCorkle | 124.05 |
| 07/23/04 | Deposition of John Tarr | 158.05 |
| 07/23/04 | Deposition of Jeffrey Larsen, M.D. | 274.98 |
| 07/23/04 | Deposition of Julie Buros | 93.27 |
| 06/10/04 | Expert fee retainer for Eric DeMaria, M.D. | 4,800.00 |
| 08/09/04 | Expert fee for Eric DeMaria, M.D. | 4,690.96 |
| 08/15/04 | Trial transcript | 825.00 |
| | Total | $19,927.46 |

The affidavit of Premier's Counsel stated:

W. Scott Sims, having been duly sworn according to law, states as follows:
1.     I am an attorney licensed to practice in Tennessee. I am counsel of record in this action for defendant Premier Medical Group, P.C. ("Premier").

21

2. An itemized list of Premier's discretionary costs in this action is attached to Premier's motion seeking an award of those costs. All of the costs included in that itemization were necessary for Premier's defense in this action and were reasonable in amount.

3. All the costs in Premier's itemization are within the scope of Tenn.R.Civ.P. 54.04(2) and are recoverable by Premier, except for $4,750.00 in charges for Dr. Eric J. DeMaria, Premier's expert. Those charges relate to review and preparation efforts by Dr. DeMaria and should be deducted from the total in the itemization.

4. Premier did not engage in any conduct in this action that justifies depriving it of the discretionary costs it is seeking to recover.

In *Mass. Mut. Life Ins. Co.*, this Court refused to allow plaintiff to recover its alleged expert witness fees, finding that plaintiff failed to adequately differentiate between the expert fee for attending the trial and the expert fee for non-recoverable trial preparation services. The Court stated:

Dr. Kenner testified at trial. Despite the trial court's opinion regarding the value of his testimony, presenting expert evidence regarding [defendant's] mental infirmities and their effect on his ability to practice psychology was necessary and reasonable. However, [plaintiff] is not entitled to recover any of Dr. Kenner's fees as discretionary costs for two reasons. First, much of his fee plainly involved non-recoverable trial preparation services. Second, the affidavit supporting the motion to assess discretionary costs does not identify which of Dr. Kenner's many fees represented his fee for attending the trial. Accordingly, [plaintiff] has failed to demonstrate that it is entitled to reimbursement for any portion of Dr. Kenner's fees.

*Mass. Mut. Life Ins. Co.*, 104 S.W.3d at 38-39.

Similarly, Premier's motion, attached exhibit, and affidavit failed to sufficiently explain the five separate entries for expert fees regarding the services of Dr. DeMaria. It is well settled that "prevailing parties cannot recover expert witness fees for preparing for depositions or trial, no matter how reasonable and necessary these fees are." *Mass. Mut. Life Ins. Co.*, 104 S.W.3d at 38. Because Premier failed to differentiate between Dr. DeMaria's recoverable and non-recoverable expert witness fees and because we cannot presume that additional evidence presented during the hearing on November 4, 2004, clarified such ambiguities, we find that Premier is not entitled to reimbursement for any portion of Dr. DeMaria's fees.

Finally, we find that Carpenter's challenge of the $825.00 discretionary cost awarded to Premier for the preparation of the trial transcript is without merit because it is a reasonable and necessary court reporter expense, clearly contemplated under Rule 54.04(2).

CONCLUSION

22

Because we find that the testimony of neither Dr. Aaron nor Dr. DeMaria was admissible in evidence under the similar locality rule, the judgment of the trial court is reversed and the case remanded for a new trial on all issues.

Since no error is asserted as to the verdict of the jury and the judgment thereon, except the error based upon the similar locality rule, no other reason exists in the record for disturbing the judgment of the trial court as to liability in this case. For this reason, we have addressed other issues raised which are ripe for disposition in the event we are found to be in error as to the similar locality rule under the record in this case. It is further appropriate to say that if we are correct as to the locality rule, the discussion of the other issues is rendered moot. Judgment for discretionary costs is reversed with imposition of discretionary costs to await the outcome of a new trial.

The judgment in the trial court is reversed and the case remanded for a new trial on all issues. Costs of the cause are assessed to Appellees.

_____
WILLIAM B. CAIN, J.