IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 1, 2016

**IN RE RYLEE R., ET AL.**

**Appeal from the Juvenile Court for Bradley County
No. J-13-401 Kurt Andrew Benson, Magistrate**

———————————————————

**No. E2016-00574-COA-R3-PT-FILED-AUGUST 11, 2016**

———————————————————

This is a termination of parental rights case. Mother/Appellant appeals the termination of her parental rights to two minor children on the statutory grounds of: (1) persistence of the conditions that led to the removal of the children from Appellant's home; and (2) substantial noncompliance with the requirements set out in the permanency plan. Appellant also appeals the trial court's determination that termination of her parental rights is in the best interests of the children, and she raises several issues concerning the admission of evidence. We conclude that the state did not establish the predicate for termination of Appellant's parental rights on the ground of persistence of conditions; however, we affirm the termination of Mother's parental rights on the ground of substantial noncompliance with the requirements of the permanency plan. We also affirm the trial court's finding that termination of Mother's parental rights is in the children's best interests.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Reversed in Part, Affirmed in Part, and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which ANDY D. BENNETT, and THOMAS R. FRIERSON, II, JJ., joined.

Wilton A. Marble, Jr., Cleveland, Tennessee, for the appellant, Laura F.

Herbert H. Slatery, III, Attorney General and Reporter, and Brian A. Pierce, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I. Background**

On or about August 15, 2013, the Department of Children's Services ("DCS," or "Appellee") received a Child Protective Services ("CPS") referral for lack of supervision regarding the two minor children at issue in this case, Rylee R. (d.o.b. July 2010) and Katie R. (d.o.b. August 2011) (together, the "Children).[1] The referral indicated that the Children's mother, Laura F. ("Mother," or "Appellant") was in the hospital following a suicide attempt. Sharon Johnson, the DCS Child Protective Investigator assigned to the case, testified that she attempted to locate Mother following her discharge from the hospital; however, the address given by Mother was not valid. After several attempts, Mother was located on August 21, 2013. Ms. Johnson testified that Mother presented with a black eye and three stitches on her eyebrow. Mother disclosed that the Children's paternal uncle, Joshua R., punched her in the eye. This event allegedly occurred at the Children's paternal grandmother, Sue R.'s, home. Mother indicated that both the Children and their father, Jeremy R., were present during the assault.[2] Although Mother stated that the Children had not directly witnessed the assault, she conceded that they were aware of what had happened when they saw blood on her face. Mother told DCS that she had left the Children at Sue R.'s house with their father. On September 3, 2013, CPS accompanied Mother to Sue R.'s home to see the children. When Mother saw Jeremy R. on the porch, she told CPS not to stop; rather, CPS took Mother to a phone, and she called Jeremy R. to inform him that CPS wanted to see the Children. By the time CPS drove back to Sue R.'s home, however, Jeremy R. had left and taken the Children with him. Although DCS attempted to locate Jeremy R. and the Children, it was unable to find them.

On September 18, 2013, Sue R. filed a petition for custody of the Children. Mother allegedly agreed to Sue R. having custody because, by her own admission, Mother was unable to care for the Children due to lack of income and her continuing mental health issues.

Jeremy R. was arrested on October 1, 2013 on outstanding warrants for domestic violence and failure to appear. He was taken into custody at Sue R.'s home and was incarcerated on October 10, 2013. On the same day, i.e., October 10, 2013, the Juvenile Court for Bradley County (the "trial court") entered a bench order of removal granting custody of the Children to DCS. The trial court specifically found that "there is domestic violence in the home and the home is not suitable for the [C]hildren." The trial court found that the paternal grandmother "harbored her son who was recently arrested at her home. She assisted her son in concealing the [C]hildren from CPS investigators."

---

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names so as to protect their identities

[2] Father's parental rights were terminated by order of April 23, 2015. He did not appeal this order and is not a party to this appeal.

On October 13, 2013, DCS held an initial Child and Family Team Meeting ("CFTM"). At the meeting, DCS attempted to address the needs of the family in order to develop a permanency plan for the Children. At this initial CFTM meeting, Mother was uncooperative and stated that she would not attend any type of counseling despite a history of domestic violence and her recent suicide attempt. Although Mother admitted that she did not, at that time, have a valid driver's license, she drove herself to the CFTM. Concerning housing, Mother stated that she was living in a house that was rented in her aunt's name. DCS developed a permanency plan on November 4, 2013, with the goal of reunification. DCS also provided Mother with a statement of her responsibilities, which listed each of her requirements under the plan. On October 15, 2013, Family Services provided Mother with information regarding the Family Resource Agency for Domestic Violence.

On October 31, 2013, the trial court held a preliminary hearing. On November 14, 2013, the trial court entered its preliminary findings and recommendations. Specifically, the court "found probable cause that the [C]hildren . . . are dependent and neglected . . . based upon domestic violence in the family and the [M]other's mental health issues following a recent suicide attempt." The court further found that it was not in the Children's best interests to remain in the custody of either Sue R. or Mother. Concerning Mother, the trial court found that Mother "is currently unstable and unable to provide a suitable home for the [C]hildren." The trial court noted that "[i]t was alleged that [M]other was still considering suicide at [the time of the hearing]. She has no stable housing or reliable transportation. Her income is not adequate to provide for the [C]hildren." Based on the foregoing findings, the trial court continued custody with DCS. At a status hearing on December 3, 2013, Family Services reported to the court that it was having difficulty determining whether Mother was compliant with the permanency plan as she was "evasive and failed to participate in scheduled meetings to review compliance."

On January 7, 2014, the trial court ratified the November 4, 2013 permanency plan. This plan was signed by Mother and, in relevant part, required her to: (1) "not display acts of domestic violence or anything with an aggressive nature in front of the [C]hildren;" (2) provide proper supervision for the Children; (3) submit to random drug screens and participate in alcohol and drug assessment if she fails; (4) provide proof of income; (5) provide DCS with a valid driver's license; (6) maintain residential stability for a minimum of six months; (7) stay in contact with DCS; and (8) obtain a mental health intake and follow all recommendations thereof. The goal of this permanency plan was reunification.

On January 7, 2014, the trial court held an adjudicatory hearing on dependency and neglect. By order entered on January 9, 2014, the trial court found "clear and convincing evidence that the [C]hildren . . . are dependent and neglected . . . based upon domestic violence in the family and [M]other's mental health issues following a recent suicide attempt." The court found that DCS "was making reasonable efforts towards reunification." Specifically, the court found that DCS was addressing the Children's behavioral and medical

issues and was supervising weekly visitation between Appellant and the Children. Based on these findings, the trial court continued custody with DCS.

On February 21, 2014, DCS held a CFTM to discuss progress and offer support and assistance to Mother in completing the requirements of the permanency plan. At that time, Mother reported that she was living with her mother and would obtain her own housing "as soon as she received her income tax return." She stated that she was looking for a trailer to rent. DCS drug tested Mother, and she tested positive for opiates and oxycodone, but was unable to produce a prescription for these medications. At the time of the meeting, Mother had not procured a valid driver's license; her license had been suspended for failure to appear in court following citation for failure to have insurance. At this time, Mother had obtained a mental health intake and had been prescribed medication for depression. However, she had not enrolled in counseling and was adamant that she would not do so. Although Mother stated that she was employed, she could not provide any verification. At a status hearing on April 10, 2014, the trial court ordered Mother to participate in a parenting assessment at DCS's expense.

On or about May 9, 2014, DCS met with Mother to review the permanency plan. At that time, Mother reported that she had broken up with her boyfriend and had placed a deposit on a two-bedroom trailer. She stated that she was using her ex-boyfriend's car and indicated that she would provide proof of insurance. At that time, Mother stated that she was working at a local grocery, but she had no proof. DCS confirmed that Mother had been recommended to obtain counseling from Hiwassee Mental Health and had been assigned a case manager; however, Mother failed to follow through despite having insurance to cover the counseling. DCS entered into a revised permanency plan with Mother. Mother's goals remained substantively unchanged from the initial plan; however, under the revised plan, in addition to those requirements set out in the original parenting plan (*supra*), Mother was also required to complete a parenting assessment. The revised plan was ratified by the trial court on June 26, 2014. On July 3, 2014, Mother submitted to a parenting assessment. DCS records indicate that Mother had failed to appear at two previously scheduled appointments. DCS was required to make special arrangements in order to allow Mother to appear a third time after two no-shows. Mother met with Dr. Alice Greaves, who recommended that she seek counseling to address past abuse, post-traumatic stress disorder, obsessive compulsive disorder, tendency to dissociate, depression, and anxiety. Dr. Greaves further recommended that Mother seek therapy to specifically address anger and rage issues and recommended that Mother join a group class for victims of domestic violence. Dr. Greaves further recommended alcohol and drug assessment if Mother failed any other drug tests.

On August 14, 2014, the trial court held a review hearing. At that time, Mother's parenting assessment was provided to the court. At the hearing, the trial court advised Mother that, without adequate housing, proof of employment, and proof of enrollment in counseling, the Children could not be returned to her. The court noted that Mother had

provided proof of transportation, insurance, and registration. Following the hearing, on or about August 21, 2014, the trial court entered a "Review Order," wherein it noted that Mother had completed the parenting assessment, which had indicated the need for further counseling. Although she initially refused to participate in counseling, the trial court's order notes that she "now states that she will attend [counseling] to address issues of past abuse, a history of domestic violence, suicide attempts and a tendency to dissociate." The court also found that DCS continued to make reasonable efforts toward the goal of reunification by providing assistance to Mother to help her complete the requirements of the permanency plan.

Mother notified DCS that she was having difficulty obtaining housing and stable employment. Accordingly, on September 12, 2014, Family Services provided Mother with resources for housing and employment. Family Services also provided Mother with information on obtaining a counselor. On September 26, 2014, DCS held another CFTM. At this time, Mother informed DCS that she had moved into a home with her sister. Mother provided a piece of paper stating that she was employed at a local grocery store. Although she was advised that DCS would need to see a pay stub or something describing her hours and pay, Mother provided no such documentation. Mother continued to state her opinion that neither Joshua R. nor Jeremy R. posed a safety concern for the Children. She stated that she would continue to allow Joshua R. and Jeremy R. to be around the Children despite the past abuse. Following the CFTM, DCS entered into a revised permanency plan with Mother. Mother's requirements remained unchanged from the May 9, 2014 plan.

On October 16, 2014, the trial court held a permanency hearing. In a November 17, 2014 order, the court noted that, despite notice, Mother did not attend the hearing. The court ratified the September 26, 2014 permanency plan, finding that it was appropriate and in the best interests of the Children. The court further found that Mother had not completed her responsibilities under the permanency plan despite DCS's efforts to assist her in doing so. Specifically, the trial court found that Mother had failed to follow the recommendations made by Dr. Greaves following the parenting assessment. Mother had failed to address her past abuse, suicide attempts, and tendency to disassociate. Instead, Mother had continued to refuse the necessary therapy despite having insurance to cover it. At the time of the October 16, 2014 hearing, Mother had not provided proof of housing or proof (other than the aforementioned note) of stable employment. Mother continued to state that, despite domestic abuse, she would not prohibit either Joshua R. or Jeremy R. from contact with the Children. DCS further informed the court that Mother continued to test positive for oxycodone, but could not provide a valid prescription. At the time of the hearing, Mother had not obtained drug or alcohol assessment as previously required by the court.

On November 4, 2014, DCS filed its petition to terminate Mother's parental rights. Therein, DCS asserted the grounds of substantial noncompliance with her requirements under the permanency plan, and persistence of the conditions that led to the Children's removal

from Mother's home. DCS also alleged that termination of Mother's parental rights was in the Children's best interests. The trial court heard the petition on April 9, 2015; however, the Children's guardian ad litem was unable to participate at the hearing. The trial court entered an order terminating Mother's parental rights on April 23, 2015. Mother appealed the April 23, 2015 order to this Court. On review, and with the agreement of all parties, this Court entered an order on October 1, 2015, wherein we set aside the trial court's order terminating Mother's parental rights and remanded the case for a new trial with the participation of the guardian ad litem. The first appeal was dismissed by order of October 20, 2015.

Per this Court's instructions, DCS's petition to terminate Mother's parental rights was re-tried on November 9 and November 12, 2015. By order of January 28, 2016, the trial court terminated Mother's parental rights on the grounds of persistent conditions and failure to substantially comply with the requirements of the permanency plan. Mother appeals.

## II. Issues

Mother raises six issues for review as stated in her brief:

1. Did the trial court err in finding that the State had proven the ground of substantial non-compliance T.C.A. 36-1-113(g)(2) by clear and convincing evidence?

2. Did the trial court err in finding that the State had proven the ground of persistent conditions T.C.A. 36-1-113(g)(3) by clear and convincing evidence?

3. Did the trial court err in finding that the State had proven, by clear and convincing evidence, that termination was in the best interest of the minor children?

4. Did the trial court err in admitting the juvenile court file docket . . .?

5. Did the court err in admitting the "Clinical Parenting Assessment for [Mother]?

6. Did the trial court err in admitting the hair follicle drug screen results [for Mother]?

## III. Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state

may interfere with parental rights only when a compelling interest exists. ***Nash–Putnam***, 921 S.W.2d at 174-75 (citing ***Santosky v. Kramer***, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." ***In re W.B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at \*7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the children's best interest. Tenn. Code Ann. § 36-1-113(c); ***In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn. 2003); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. ***Santosky***, 455 U.S. at 769. Accordingly, both the grounds for termination and that termination of parental rights is in the children's best interests must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); ***In re Valentine***, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004), *perm. app. denied* (Tenn. July 12, 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***Id***. at 653.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002).

## IV. Evidentiary Issues

Mother argues that the trial court erred in admitting, as trial exhibit 2, the "entire juvenile file," which includes both the clinical assessment and the drug screen results referenced in Issues 5 and 6 above. In her argument, Mother relies, in part, on Tennessee Rule of Appellate Procedure 8A, which provides:

> (c) In addition to the papers excluded from the record pursuant to Rule 24(a), any portion of a juvenile court file of a child dependency, delinquency or status case that has not been properly admitted into evidence at the termination of parental rights trial shall be excluded from the [appellate] record.

Contrary to Mother's argument, Rule 8A does not preclude, from the appellate record, those portions of the juvenile record that may have been admitted at the trial of the petition to terminate parental rights. Rather, this Court must limit its review to those documents filed after the filing of the petition for termination, **unless subsequently entered into the record-made an exhibit at trial**, entered into evidence by stipulation of the parties or by order of the court. It is not proper to include extraneous documents in the record or for this Court to consider them on appeal. *See In re M.J.B.*, 140 S.W.3d at 651. In other words, Rule 8A addresses those instances where the juvenile record (or any portion thereof) is not admitted into evidence at the hearing on the petition to terminate parental rights, but is, nonetheless included in the appellate record. Here, however, the juvenile file was admitted as trial exhibit 2. Therefore, Rule 8A is not triggered to preclude the file from our record. Regardless, we have reviewed the record in this case, and there is sufficient evidence to support termination of Mother's parental rights even if we exclude the juvenile file. Specifically, all permanency plans were admitted into evidence independent of the juvenile file. The trial court's finding that Mother failed to comply with the requirements contained in those plans is based on evidence adduced at the hearing, as discussed *infra*. Thus, even if we allow, *arguendo*, that the juvenile file should not have been part of the record on appeal, and even if we go so far as to allow, arguendo, that the juvenile file was improperly admitted into evidence at the hearing before the trial court, the existence of independent evidence to support at least one of the grounds for termination of Appellant's parental rights would render such error harmless. *Carpenter v. Klepper*, 205 S.W.3d 478, 485 (Tenn. Ct. App. 2006), *perm. app. denied* (Tenn. Oct. 2, 2006) ("It is well established that if erroneously admitted evidence is merely cumulative of other evidence presented in the case, its admission does not constitute reversible error.") (internal citations omitted).

### V. Grounds for Termination of Parental Rights

As noted earlier, the trial court relied on the following statutory grounds in terminating Appellant's parental rights: (1) substantial noncompliance with the Tennessee Code Annotated Section 37-2-403 permanency plan, Tennessee Code Annotated Sections 36-1-113(g)(2); and (2) persistence of conditions, Tennessee Code Annotated Section 36-1-113(g)(3). Although only one ground must be proven by clear and convincing evidence in order to terminate a parent's rights, the Tennessee Supreme Court has instructed this Court to review every ground relied upon by the trial court to terminate parental rights in order to prevent "unnecessary remands of cases." *In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010). Accordingly, we will review both of the foregoing grounds.

### A. Reasonable Efforts

Before addressing the specific grounds for termination of Appellant's parental rights, we note that, historically, the decision to pursue a termination of parental rights on the

grounds of substantial noncompliance with a permanency plan has invoked DCS's statutory duty to make reasonable efforts to facilitate the safe return of children to the parent's home. *In re R.L.F.*, 278 S.W.3d 305, 315 (Tenn. Ct. App. 2008) (citing Tenn. Code Ann. §§ 37-1-166(b), –166(a)(2), –166(g)(2)); *see also In re Tiffany B.,* 228 S.W.3d 148, 151, 160 (Tenn. Ct. App. 2007) (vacating a finding of abandonment, substantial noncompliance, and persistence of conditions for failure to make reasonable efforts). However, in *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015), the Tennessee Supreme Court specifically overruled "the holding of *In re Tiffany B*. and other cases following the holding in *In re C.M.M.* to the extent that the court required DCS to prove by clear and convincing evidence that it made reasonable efforts to reunify as a precondition to termination of parental rights (citations omitted)." *Id.* at 555 n. 34. Proof of reasonable efforts is specifically required by statute to prove the ground of persistent conditions. However, even under that ground for termination, DCS's efforts to assist the parent "may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal." *Id.* (citing Tenn. Code. Ann. § 36-1-102(1)(A)(ii)). In *Kaliyah*, the Court specifically stated that

> proof of reasonable efforts is not a precondition to termination of parental rights of a respondent parent. As with other factual findings made in connection with the best interest analysis, reasonable efforts must be proven by a preponderance of the evidence, not by clear and convincing evidence. *In re Audrey S.*, 182 S.W.3d at 861. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that the termination is in the child's best interest (citations omitted).

*Id*. at 555.

Turning to the record, Family Services Worker, LeAnn Smith, was the primary worker on this case. Ms. Smith testified that she discussed Mother's responsibilities under the permanency plans with Mother and offered assistance to Mother. Specifically, DCS paid for the parenting assessment. In addition, Ms. Smith testified that, on multiple occasions, she discussed with Mother the importance of obtaining counseling and therapy and following the recommendations of the providers. Ms. Smith testified that she offered recommendations for treatment. Likewise, Stephanie Gayle, another Family Services Work assigned to the case, testified that DCS would set up appointments for counseling on behalf of Mother, but Mother would often fail to attend. Without extending the length of this opinion to set out every effort DCS made to assist Mother, suffice it to say that, from the totality of the circumstances, there is clear and convincing proof that DCS did, in fact, make reasonable efforts to assist Mother in this case. Despite DCS's best efforts, however, the record indicates that Mother has failed to avail herself of these opportunities, *see* discussion *infra*.

**B. Persistence of the Conditions that Led to the Children's Removal**

Tennessee Code Annotated Section 36-1-113(g)(3) provides that termination of parental rights may be based upon persistence of conditions. Persistence of conditions is defined as:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months:
>
> (A)    The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (B)    There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> (C)   The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn.Ct.App.2010), overruled on other grounds by *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn.2015).

In its order terminating her parental rights, the trial court specifically found that DCS had proven, by clear and convincing evidence, that Mother had failed to remedy the conditions that led to the Children's removal from her custody. Specifically, the trial court found that Mother

> has not adequately addressed the mental health issues in a timely fashion. The children were placed into custody following a suicide attempt [b]y [Mother] and issues of domestic violence. Since that time, [Mother] has failed to follow through with the therapy recommended by various professionals and in June 2015 attempted to take her life by taking sleeping pills. Then again two weeks later is taken back to the ICU following an overdose of sleeping pills and she has returned again in October 2015 following a statement regarding suicide. She is without stable housing or full time employment and is only now attending therapy sessions, but has only attended four sessions since June 2015.

In *In re Audrey S.*, 182 S.W.3d 838, 872 (Tenn.Ct.App.2005), *perm. app. denied*

(Tenn. Nov. 7, 2005), this Court held that, "based on the statutory text and its historical development, [the ground of persistence of conditions found in Tennessee Code Annotated Section 36-1-113(g)(3)] applies as a ground for termination of parental rights only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.*, 182 S.W.3d at 872. In the first instance, the Children were not, in fact, removed from Mother's home; rather, they were removed from Sue R.'s home. *In re Destaney D.*, No. E2014-01651-COA-R3-PT, 2015 WL 3876761, *6 (Tenn. Ct. App. June 23, 2015) ("[W]e hold that the statutory ground of persistence of conditions is not applicable to Father . . . inasmuch as the record contains no order removing the Children from Father's home."). More importantly, however, it was not the order adjudicating dependency and neglect that precipitated the Children's removal to state custody; rather, it was the petition for custody that was filed by Sue R. As noted above, the Children were placed in DCS's custody pursuant to an October 10, 2013 bench order of removal, wherein the juvenile court specifically found that "there is domestic violence in [Sue R.'s] home and the home is not suitable for the [C]hildren." The trial court also found that Sue R. "harbored her son who was recently arrested at her home. She assisted her son in concealing the [C]hildren from CPS investigators." Likewise, in *In re Audrey S.*, the removal of the children to state custody was based on the father's petition for a change in custody, and was not based on an adjudication of dependency and neglect. *In re Audrey S.*, 182 S.W.3d at 875. Accordingly, this Court held that the trial court erred in relying on the statutory ground of persistent conditions to terminate parental rights. *Id*. at 876.

Because the Children were not, in fact, removed from Mother's home, nor by an order adjudicating dependency and neglect, we conclude that Appellee failed to meet the threshold requirement for application of the ground of persistent conditions. Accordingly, we reverse the trial court's finding that Mother's parental rights should be terminated on this ground and turn to the remaining ground of substantial noncompliance with the requirements of the permanency plan.

### C. Substantial Noncompliance with the Requirements of the Permanency Plan

Tennessee Code Annotated Section 36-1-113(g)(2) provides that parental rights may be terminated when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan." However, as discussed by this Court in *In re M.J.B.*, 140 S.W.3d 643 (Tenn.Ct.App.2004):

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re*

- 11 -

> *Valentine*, 79 S.W.3d at 547; ***In re L.J.C.***, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. ***In re Valentine***, 79 S.W.3d at 548-49; ***In re Z.J.S.***, 2003 WL 21266854, at \*12. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. ***In re Valentine***, 79 S.W.3d at 548.

*Id*. at 656-57. "Nonetheless, the permanency plans are not simply a series of hoops for the biological parent to jump through in order to have custody of the children returned." ***In re C.S., Jr., et al.***, No. M2005-02499-COA-R3-PT , 2006 WL 2644371, at \*10 (Tenn. Ct. App. Sept. 14, 2006). Rather,

> the requirements of the permanency plan are intended to address the problems that led to removal; they are meant to place the parent in a position to provide the children with a safe, stable home and consistent appropriate care. This requires the parent to put in real effort to complete the requirements of the plan in a meaningful way in order to place herself in a position to take responsibility for the children.

*Id*.

As noted above, the trial court ratified several permanency plans finding that the Appellant's requirements were reasonably related to remedying the reason for foster care and were in the Children's best interests. Mother's responsibilities under these plans were to: (1) provide appropriate supervision for the Children; (2) sign all required released for DCS to ensure proper case management; (3) submit to random drug tests; (4) obtain alcohol and drug assessment; and (5) provide a current valid driver's license, proof of car insurance, vehicle registration, and transportation plan; (6) provide proof of legal income; (7) maintain residential stability for a minimum of six months; (8) maintain contact with Family Services and report any change in circumstance within 24 hours; (9) take all medications as prescribed; (10) obtain a mental health intake and follow all recommendations thereof; (11) maintain health insurance; and (12) complete a parenting assessment.

Concerning the foregoing requirements, in its order terminating her parental rights, the trial court made specific findings that Mother had: (1) "failed to address mental health concerns raised in her mental health assessment and parenting assessment by attending recommended therapy and domestic violence counseling;" (2) had failed to provide proof of residential stability; (3) continued to test positive for unprescribed medications; (5) had failed to follow through with the recommendations of her alcohol and drug assessment. Although the trial court found that Mother had provided proof of a valid driver's license and had complied with DCS by signing releases, the trial court stated that it "cannot find that this

compliance is in any way substantial when she has failed to follow through with addressing the root cause of the children's placement into foster care; unaddressed mental health concerns." The record supports this finding.

As found by the trial court in several of its orders, the primary concerns in this case are with domestic violence and Mother's unaddressed mental health issues. In treating Mother, Dr. Greaves opined that "If [Mother's] anger gets out of control or dissociation reaches a severe point, or her suicidal desire returns, the safety of the children in the household can be endangered." Dr. Greaves further opined that, if Mother engages in therapy and commits to addressing her issues, then she may be able to ensure the Children's safety and her own. However, Dr. Greaves explained that, if Mother "chooses to keep things as they are," then "things might only get worse and cause more serious impairment to her mental health, which would also likely affect her children."

During her testimony, Mother admitted that, following the trial date on April 9, 2015, where her parental rights were initially terminated, she attempted to take her life by overdose of sleeping pills on June 8, 2015. She was taken to the hospital where she was placed on life support for a period of time. After she was stabilized, Mother was transported to a mental health facility, where therapy was recommended. Although a therapy session was scheduled, Mother failed to attend. Mother also acknowledged that, on or around June 20, 2015, she was again admitted to the hospital in respiratory distress following an event where she admitted to taking extra sleeping pills. Mother claimed that she was not attempting suicide, but testified that she was attempting to go to sleep and that is why she took the extra medication. Following the June 20, 2015 event, Mother was again placed on life support for a day and was transferred back to the mental health facility. This time, she took the medical advice to attend therapy. However, on October 27, 2015, she was again found unresponsive after stating that it "would be best if [she] just died." Mother stated that she was not attempting suicide on October 27, 2015. Although, during her testimony, Mother acknowledged that she is in need of therapy, she admitted that she has chosen not to follow the recommendations of providers because "she did not want to." It appears that Mother has only recently made efforts toward addressing her mental health issues by attending some counseling sessions; however, she had failed to attend all of her scheduled sessions.

In addition to the mental health concerns, which have gone largely unaddressed, Mother has failed to show an ability to maintain stable housing and employment. At the time of the hearing, she had been living with her boyfriend in a hotel room for over a month. Mother testified that, following her release from the hospital in June of 2015, she had lived in at least two other hotels and had moved approximately five times since the summer of 2015. Mother openly acknowledged that her housing was not suitable for the Children, but claimed that she intended to look for other housing.

Meanwhile, the Children have been in foster care. There is no clear evidence that Mother will, in fact, follow through with the necessary therapy, or that her mental health issues will be resolved at any early date. In light of her suicide attempts, there can be no doubt that Mother's issues are serious. The fact that Mother has not taken the opportunities afforded, during the pendency of this case, to address these issues is disheartening.

We conclude, therefore, that the facts, as found by the trial court, are supported by the preponderance of the evidence and clearly and convincingly establish the elements necessary to terminate Appellant's parental rights on the ground of substantial noncompliance with the requirements of the permanency plan. Tenn. Code Ann. § 36-1-113(g)(2) *Jones v. Garrett*, 92 S.W.3d at 838. Because only one ground for termination must be found, by clear and convincing evidence, our reversal of the trial court's finding that termination was warranted on the ground of persistent conditions does not require reversal of the trial court's ultimate decision to terminate Appellant's parental rights so long as there is clear and convincing evidence that termination of Appellant's parental rights is in the Children's best interests. Tenn. Code Ann. § 36-1-113(c). We now turn to address that question.

### VI. Best Interests

When at least one ground for termination of parental rights has been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. *In re Audrey S*., 182 S.W.3d at 877. The focus shifts to the child's best interest. *Id*. at 877. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. *Id*. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *Moody*, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include, but are not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration

- 14 -

of time that lasting adjustment does not reasonably appear possible;

\*\*\*

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

\*\*\*

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child . . . .

Tenn. Code Ann. § 36-1-113(i). This Court has noted that "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

In its order terminating her parental rights, the trial court found that Mother has "not made changes to her conduct and circumstances that would make it safe for the children to go home." Tenn. Code Ann §36-1-113(i)(1). During her testimony, Mother stated that she is not ready for the Children to return to her care. We agree. Because Mother has failed to address her mental health issues and has failed to maintain stable housing or employment, there is clear and convincing evidence that she has failed to make any meaningful adjustment of circumstance so as to allow the Children's safe return to her custody. The trial court also found that Mother has "not made lasting changes in her lifestyle or conduct after reasonable efforts by the State to help." The evidence indicates that, during the 25 months that these

- 15 -

Children have been removed from her custody, Mother has failed to make any significant improvement in her living conditions in terms of stable housing or employment. More importantly, however, Mother has continued to abuse prescription medications, has attempted suicide on several occasions during the pendency of this matter, and has failed to address her mental health issues. As discussed by Dr. Greaves, Mother's failure to address these issues indicates that her mental and/or emotional status poses a substantial risk of harm to the Children. Accordingly, it is not in their best interests to be returned to Mother's care.

Meanwhile, the evidence suggests that these Children have flourished in their foster home. The Children's foster mother testified that, when the Children were first placed in her home, they showed some concerning behavior. Specifically, the older child would show her genitals and touch herself inappropriately. Both Children would play games where one would lie on the floor as if she were dead and the other child would say, "Mommy, are you dead, wake up mommy." The foster mother testified that she found this behavior disturbing and had to redirect the Children and teach them that the game was inappropriate. The foster mother also testified that the older child would attempt to wake the foster mother up by asking, "Are you dead?" In addition, after they were placed in foster care, the Children would often talk about incidents of domestic violence, and they were very sensitive to loud noises. Having addressed these issues, however, the foster mother testified that the Children are now well adjusted to her home, and they consider their foster parents to be their parents.

From the totality of the circumstances, it appears that the Children are thriving in their new environment and that a change in custody, at this point, would be detrimental to their mental and emotional wellbeing. This is especially so in light of the fact that Mother has failed to effect any lasting change in her circumstances by addressing her mental health issues. Accordingly, we conclude that the facts, as found by the trial court, are supported by the preponderance of the evidence and clearly and convincingly establish that termination of Appellant's parental rights is in the Children's best interests.

### VII. Conclusion

We reverse the trial court's order terminating Appellant's parental rights on the ground of persistence of the conditions that led to the Children's removal. We affirm the order of the trial court terminating Appellant's parental rights on the ground of substantial noncompliance with the requirements of the permanency plan, and the trial court's finding that termination of Appellant's parental rights is in the Children's best interests. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellant, Laura F. Because Appellant is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE